535 So.2d 573 (1988)
Wilmena W. WHITTINGTON
v.
Clyde E. WHITTINGTON, Sr. et ux, et al.
Thomas G. KLEINPETER
v.
Wilmena W. WHITTINGTON.
No. 57672.
Supreme Court of Mississippi.
November 23, 1988.
*574 David B. Gross, Jackson, for Wilmena W. Whittington.
Bryan C. Harbour, Robison & Harbour, McComb, for Thomas G. Kleinpeter.
H.B. Mayes McGehee, McGehee, McGehee & Torrey, Meadville, for Clyde E. Whittington and Freddie G. Whittington.
Robert W. Brumfield, Brumfield & Austin, McComb, for Robert R. Jacobs and Donald L. Smith.
Alex A. Alston, Jr., Beth C. Clay, Thomas, Price, Alston, Jones & Davis, Jackson, for John P. Weeks, Administrator of the Estate of Edward B. Launius.
En Banc.

ON PETITION FOR REHEARING
DAN M. LEE, Presiding Justice, for the Court:

I.

STATEMENT OF THE CASE
The original opinion in this case was handed down June 3, 1988, affirming the learned chancellor as to all points and all parties. In due course, Wilmena W. Whittington (Appellant) filed a petition for rehearing alleging that the Court had erred in affirming as to the award of punitive damages of $40,000, as well as two other assignments of error. We find the petition for rehearing is well-taken as to the affirmance of the allowance of punitive damages, when no net worth of appellant had been established, but find no merit as to the other alleged errors. We withdraw the original opinion, modify it to deny punitive damages and hand down the following as the opinion of the Court.
On April 9, 1974, Clyde Whittington (Clyde) conveyed by quitclaim deed to Wilmena Whittington (Wilmena) all of his land, reserving one-quarter (1/4) of one-eighth (1/8) of eight-eighths (8/8) royalty, and one-quarter (1/4) of any bonus or delay rentals received on any lease which Wilmena should execute in the future on the minerals. The reservation was binding on all subsequent lessees and grantees. Clyde conveyed to Wilmena all rights to execute leases. On August 1, 1983, Clyde and Freddie G. Whittington filed suit in the Chancery Court of Amite County against Wilmena, Edward B. Launius, Robert R. Jacobs, Oil Star Corporation, Donald L. Smith, Tri-M Corporation, Coquina Oil *575 Company, Thomas G. Kleinpeter, and some 28 other assignees of Wilmena to recover one-fourth (1/4) of the bonus consideration for a ten-year paid-up oil and gas lease executed by Wilmena to Edward B. Launius in 1975. Clyde alleges that Wilmena fraudulently concealed the bonus, in the form of a 5% overriding royalty interest and one-half (1/2) of the working interest retained in the lease by Launius, in a side-letter agreement entered into between her and Edward B. Launius on the same day as the oil and gas lease was executed.
Wilmena counter-claimed against Clyde, alleging she had no duty to tell him she had leased the property. Wilmena also cross-claimed against Launius, Jacobs, Oil Star, Tri-M, Smith, and Coquina, alleging fraud in that Launius concealed from her one-half (1/2) of the profits and working interest she was entitled to pursuant to the first of two side-letter agreements between Wilmena and Launius whereby she would share equally in profits from promoting the lease and any working interest retained by Launius.
Thomas Kleinpeter cross-claimed against Wilmena, alleging he is entitled to one-half (1/2) of said bonus by virtue of her conveyance to him in April 1977 of all the surface acres and one-half (1/2) of the mineral acres of the estate conveyed to her by Clyde.
Appropriate answers were filed as to all of these complaints. Pursuant to various motions for summary judgment and arguments thereon, Chancery Judge R.B. Reeves, in a pre-trial hearing, ruled that the obligation to make payments from the lease to Clyde was Wilmena's responsibility as sole owner of the executive rights, and her failure to do so in no way affects subsequent owners of the lease. He also granted the summary judgment motions in favor of several of the defendants because they were bona fide purchasers of their various interests in the lease. Wilmena's counter-claim against Clyde was struck as immaterial and irrelevant.
At the close of the pre-trial hearing on motions, the parties to the lawsuit were aligned as follows: Clyde Whittington claimed against Wilmena Whittington, Edward B. Launius, Robert R. Jacobs, Oil Star, Inc., Harold D. Baker, Thomas G. Kleinpeter, Tri-M Petroleum Company, Donald L. Smith and Coquina Oil Corporation. Wilmena Whittington cross-claimed against Launius, Jacobs, Oil Star, Tri-M Petroleum, Donald L. Smith and Coquina Oil Corporation. Thomas Kleinpeter cross-claimed against Wilmena Whittington. The complaint of Clyde Whittington against Edward B. Launius, and the cross-claim of Wilmena Whittington against Edward B. Launius were amended to claim against the estate of Edward B. Launius, John P. Weeks, Administrator C.T.A., because Edward B. Launius died four days after the original complaint was filed.
The facts, as adduced during seven days of trial, including some 103 exhibits, follow.

II.

FACTS
On April 9, 1974, the same day he was granted a divorce from Wilmena Whittington, Clyde Whittington conveyed to Wilmena all of his land, including the mineral estate, reserving one-fourth (1/4) of one-eighth (1/8) of eight-eighths (8/8) non-participating royalty. All rights to execute leases were also conveyed to Wilmena in return for one-fourth (1/4) of any bonus or delay rentals received for the execution of any future leases. These reservations were binding on all subsequent lessees and grantees. The conveyance was recorded in Amite County, Mississippi. In 1982, Clyde became aware that drilling had commenced on the property when he drove by and saw the rigs. Without contacting anyone about the status of any bonus payment that might be due him, Clyde filed this lawsuit against Wilmena and some 38 assignees of the lease interest to recover his share of the bonus, and asked for punitive damages against Wilmena for fraudulently concealing the bonus she received for executing the lease.
On April 3, 1975, Wilmena leased all her minerals to Edward B. Launius in a paid-up lease with a primary term of 10 years, reserving a one-eighth (1/8) royalty. The *576 bonus stated on the face of the lease was $10. The lease was recorded in Amite County. On the same day, Wilmena entered into an unrecorded side-letter agreement with Launius that stated that, as a bonus for executing the lease, Launius would at some time in the future give Wilmena a one-sixteenth (1/16) overriding royalty, one-half (1/2) of all the money he received for promotion of the lease, and one-half (1/2) of any working interest Launius retained in promotion of the lease.
On April 25, 1977, Wilmena sold all her surface estate and one-half (1/2) of her mineral estate to Thomas Kleinpeter, subject to all prior reservations and leases. This conveyance was recorded in Amite County. The warranty deed does not except bonus payments; however, Kleinpeter was not aware that the minerals were leased to Launius and was not aware of the side-letter agreement which provided for bonus, when he bought the property. Kleinpeter did not check any land records before he purchased the property, but accepted the Federal Land Bank's mortgage record that the title was clear. Although Kleinpeter did not expect to receive any royalty when he purchased the property since he was not aware that the minerals were leased, he has been receiving royalty checks since production was obtained from the wells.
On April 28, 1978, Launius assigned the "Wilmena" lease to Oilstar Corp., a corporation solely owned and operated by Launius. On June 27, 1978, Oilstar assigned the "Wilmena" lease to Coquina Oil Corp., reserving a 7-1/2% overriding royalty. Coquina paid Oilstar $25,000 for the lease, which Launius kept as his expenses in promoting the lease. Thereafter, Coquina discovered a title failure on 137.5 acres under the lease, which Launius could not reimburse, so Coquina bought leases from the holders of the 137.5 acres. Coquina did not record the lease from Launius for four and one-half (4 1/2) years, because there was no landman in Coquina's Jackson office; their Midland, Texas office had the lease; and everyone forgot about it. Furthermore, Coquina was not particularly interested in developing the lease acres, so there was no push to complete an entire drilling block, which is customary in the industry to do before recording leases. However, all of the clean-up leases obtained by Coquina were recorded in October 1978. At the time it bought the "Wilmena" lease, Coquina had no knowledge of the collateral agreement between Wilmena and Launius; therefore, Coquina asserts it had no responsibility to inform Wilmena it had the lease. (The trial court granted summary judgment on this particular issue as to Coquina.) There was no agreement between Launius and Coquina that Coquina would not record the lease in order to conceal the fact that Launius had sold the lease for $25,000.
On July 24, 1978, Launius and Wilmena entered into a second letter agreement whereby Launius would pay Wilmena, as a bonus, a 5% overriding royalty (reduced from the original one-sixteenth or 6.25%) and one-half (1/2) of any working interest he retained in the lease. They dropped the requirement that Launius would pay her one-half (1/2) of the revenue from promotion of the lease. Wilmena claims that Launius tricked her into signing this second letter agreement by telling her that this paper was one of a stack of papers she must sign in order to correct the title description to exclude the 137.5 acres from the lease. Launius did not tell her he had assigned the lease to Coquina or that he had received $25,000 for the assignment. Neither did he tell her at that time that he had previously assigned the lease to Oilstar, his corporation. Wilmena claims she became aware of the second letter agreement only after this lawsuit was filed; therefore, she does not acknowledge the second agreement, and asked in her cross-claim against the Launius Estate for the terms of the original agreement  one-sixteenth (1/16) overriding royalty, one-half (1/2) profits for promotion of the lease, and one-half (1/2) of any working interest he retained. She also asked for one-half (1/2) of the $25,000 Launius obtained when he sold the lease to Coquina, since he sold the lease, in any event, before Launius tricked her into signing the second agreement. Furthermore, Wilmena contends that the second letter agreement *577 should be invalid because there is nothing in Launius' files to indicate he gave consideration for the second letter agreement.
In 1980, Wilmena became discouraged about the oil prospects on her land, having received no money from the lease. She asked Launius for the lease back. On September 9, 1980, she received a letter from Launius telling her, finally, that he had sold the lease to Coquina. He calculated her royalty acres under both the terms of the lease to him and the assignment to Coquina. His calculations were based on a 5% overriding royalty, the terms of the second agreement, rather than 6 1/2% overriding royalty, the terms of the first agreement. It is not clear, however, that Wilmena knew how to calculate royalty acres such that this letter had any significance to her.
In early 1982 Launius approached his friend, fellow geologist, and oil and gas investor, Robert Jacobs, asking if Jacobs had a prospect in the Whittington acreage. Jacobs said he did, whereupon Launius told him that he, Launius, had sold his lease on the minerals to Coquina. At that point, they verbally agreed to form a partnership to develop the lease. Jacobs agreed to negotiate a farmout agreement with Coquina and work the prospect. In return Launius would split his 2-1/2% overriding royalty retained from the sale to Coquina, and he and Jacobs would split all expenses and profits 50/50. They did not discuss any of Launius' earlier difficulties with Coquina over the title failure of 137.5 acres, nor did they discuss any of the details of Launius' side agreements with Wilmena.
Jacobs obtained the farmout agreement from Coquina on April 21, 1982, in his name only. On May 26, 1982, Launius and Jacobs signed a partnership agreement. Jacobs struck a two-well deal with Coquina; if he successfully drilled one well, Jacobs would earn three 80-acre units; if he successfully drilled the second well, he would earn the rest of the 1100 acres under the lease. He actually had to drill three wells before he earned the lease to all the acreage.
Jacobs took a 75% lease from Coquina because the lease was already burdened 20%  7 1/2% to Launius, one-eighth (12 1/2%) royalty to Wilmena; Coquina retained a 5% overriding royalty. However, Jacobs claimed he did not know to whom the 20% burden belonged. He only knew that Launius had a 2 1/2% overriding royalty from somewhere, but Launius had told him nothing more about the terms of the original lease from Wilmena. Jacobs assigned his 75% working interest as follows: Williams Drilling agreed to buy in one-eighth (12 1/2%) for $65,000, which they deducted from drilling costs; Beau Coup Oil bought a 50% interest for $220,000. The turnkey price for drilling totalled $285,000, which was covered by the Williams Drilling and Beau Coup interests. Shields Resources bought 25% at $120,000, which was deposited in a Jacobs/Launius joint account as profit. Jacobs retained a 12 1/2% working interest for the joint venture. On December 22, 1982, Beau Coup Oil and Jacobs obtained a drilling permit for the Whittington Well # 1.
The farmout agreement was not recorded, which Jacobs claims is the custom in the industry because no money changes hands. The one taking the farmout assumes the risk and expense of drilling. The interest in the lease is recorded after it is earned by successful drilling. At the time of the farmout Coquina was not aware that Launius and Jacobs were in a joint venture to promote the lease. Again, Jacobs claims it is not unusual in the industry to take a farmout in only one person's name, no matter how many people are involved in promotion of the lease.
The law firm of McKibben, Lake and Tolbert did the title work for Launius and Jacobs on Whittington Well # 1. The title opinion notes the one-fourth (1/4) of one-eighth (1/8) of eight-eighths (8/8) royalty Clyde reserved in his conveyance to Wilmena. It does not, however, note the one-fourth (1/4) bonus reservation because the attorneys considered it clearly Wilmena's obligation to pay Clyde his share of any bonus since that obligation goes with the right to execute leases. The title opinion also includes Kleinpeter as 50% owner of the mineral estate. The farmout from Coquina *578 to Jacobs was not reflected in the title opinion, but all of the farmout lease owners were. The farmout agreement was eventually recorded on December 17, 1982. Before the wells began to produce, Coquina's assets were sold to Santa Fe by stock transfer. Coquina received no profits when production began.
On January 6, 1983, Launius and Jacobs took Don Smith into the joint venture as a partner, in return for Smith's seismic work on the lease. The three were to split as follows: 40% for Launius, 40% for Jacobs and 20% for Smith. Therefore, the 12 1/2% working interest Jacobs retained in the farmout went 5% to Launius, 5% to Jacobs, and 2 1/2% to Smith. Smith did not know about the Whittington lease, and he did not receive any share of Launius' 2 1/2% overriding royalty retained from his sale of the lease to Coquina.
On January 14, 1983, about a week away from logging in the first Whittington well, Launius, through Oilstar, assigned a 5% overriding royalty to Wilmena. Jacobs witnessed the assignment and it was the first time Jacobs was aware of any agreement between Launius and Wilmena. He understood the assignment to be something Launius held out for her. Wilmena claims, however, that she bought the 5% overriding royalty from Launius for $25,000 cash, and that Launius did not assign it to her as a bonus pursuant to their side-letter agreement. However, Wilmena obtained no receipt for the sale. She allegedly borrowed $25,000 in cash from her friend, E.E. Lawson, who brought the cash to her in a paper sack. Lawson took a promissory note from Wilmena which states that the money is to purchase overriding royalty. (The promissory note was introduced into evidence.) Wilmena repaid the money on March 31, 1983, in cash. There is no documentation as to where Lawson got the money because he kept it at home in his safe. Lawson likewise could offer no documentation as to where he put the money after it was repaid because he has hidden it in a different place now.
Wilmena claims she bought and sold this 5% overriding royalty because she had so far earned no money on her lease, and feared no production would come in. She did not want to be left with nothing. She did not connect the fact that if Launius sold her a 5% overriding royalty from the 7 1/2% overriding royalty he retained from the sale to Coquina, Launius would not have enough left to assign her a 6 1/4% overriding royalty (or 5% under the second agreement) pursuant to their side letter agreement when production came in. She never asked Launius about the bonus, but just assumed she would still get her overriding royalty even if she bought this 5%. Unfortunately, no one has any knowledge that Launius received $25,000 for this 5% overriding royalty, and there is nothing in his files or documents to indicate that he actually sold the overriding royalty. Wilmena sold her 5% overriding royalty to Albert Newman on the acres where actual drilling was taking place for $8,800 the same day Launius assigned it to her. On March 16, 1983, she assigned her 5% overriding royalty under all the rest of the drilling sites to Harold Baker for $108,000.
On February 18, 1983, Launius assigned one-half of his 2 1/2% overriding royalty, retained from the lease sale to Coquina, to Jacobs, pursuant to their partnership agreement. Production on the Whittington wells came in on February 19, 1983, and by February 25, 1983, Launius, Jacobs and Smith had realized $86,000 profits for their joint venture, split 40%/40%/20%. Launius' share amounted to nearly $35,000. The 12 1/2% working interest which Jacobs had retained for the joint venture from the Coquina farmout was also split up  5%/5%/2 1/2%  among Jacobs, Launius and Smith. Launius asked that his 5% working interest be assigned to Tri-M Petroleum, a joint venture composed of the law firm partners of McKibben, Tolbert and Lake. Two percent of the 5% went to the law firm as payment for Launius' outstanding legal fees. The other 3% was held by Tri-M as a bare trust for Launius. Tri-M also held title to the entire 5% for purposes of dealing with the drilling operators, Shields Resources, so that Shields would not have to contend with minuscule interests. Tri-M was not aware of Launius' side-letter *579 agreements with Wilmena. Wilmena claims that one-half (1/2) of Launius' 3% working interest is hers. Neither Jacobs nor Smith were involved in any way with Tri-M.
On July 27, 1983, Edward B. Launius died. Four days later, August 1, 1983, Clyde filed his complaint. Production from the Whittington wells (about 13 in all) through March 1985 was logged in at 250,160 barrels at $28.19 per barrel, totalling $7,052,010.

III.

CHANCELLOR'S FINDINGS

1) Clyde v. Coquina Oil Company

Plaintiffs Clyde and Freddie Whittington failed to meet the burden of proof as to fraud or gross disregard for their rights, or that Coquina had any knowledge of any agreements between Wilmena and Launius. As to whether or not Coquina acted with gross disregard as to the plaintiffs by failing to record its assignment from Launius for some four years, the chancellor found that the failure to record was at Coquina's own peril and did not damage the plaintiffs. There was no proof that Launius conspired to commit fraud as to plaintiffs. Coquina was dismissed with its costs.

2) Clyde v. Jacobs, Smith and Tri-M

Any fraud by Launius could not be imputed to Jacobs, Smith or Tri-M, since he acted some eight years previously on his own in obtaining and selling Wilmena's lease. There was no proof that Jacobs, Smith or Tri-M had notice of any of these dealings with Launius and Wilmena. Smith was dismissed with his costs. The plaintiffs failed to establish by clear and convincing evidence fraud, conspiracy or concealment as to Jacobs and Tri-M. They, too, were dismissed with their costs.

3) Kleinpeter v. Wilmena

The chancellor found that the deferred bonus was not part of the agreement between Kleinpeter and Wilmena when Wilmena conveyed her surface and one-half (1/2) of her mineral acres to Kleinpeter. The warranty deed stated, "subject to all prior mineral rights and royalty transfer." Kleinpeter did not bargain for nor did he pay for a share of the deferred bonus. The cross-claim was dismissed at cost to Kleinpeter.

4) Wilmena v. Estate of Launius

Wilmena's testimony as to her claim against Launius' Estate was not competent under the Dead Man Statute. Therefore, the second letter agreement supersedes the first. There was no competent evidence that speaks to whether or not she signed the second agreement by fraud or trick. Her signature appears on the agreement. Furthermore, the assignment of the 5% overriding royalty by Launius to Wilmena was in satisfaction of the second letter agreement. There was no competent evidence that Wilmena paid him $25,000 for that overriding royalty. Wilmena is entitled to one-half (1/2) of the 3% working interest retained by Launius in the farmout from Coquina to the joint venture of Jacobs/Launius. Clyde is entitled to one-fourth (1/4) of that one-half (1/2).

5) Clyde v. Wilmena

The bonus was payable to Wilmena pursuant to the conveyance from Clyde to Wilmena in 1974. She was liable to Clyde for one-fourth (1/4) of the bonus, being the 5% overriding royalty, which she obtained from Launius pursuant to the Wilmena/Launius side-letter agreement. The executive owner's rights are limited by a duty of utmost good faith and fair dealing. Wilmena breached that duty and concealed the bonus. She sold and disposed of her 5% overriding royalty and did not give Clyde his share. Clyde, therefore, is entitled to one-fourth (1/4) of the 5% overriding royalty, and the production obtained from that 5% overriding royalty from January 14, 1983, the date Wilmena acquired the overriding royalty. Clyde further is entitled to one-fourth (1/4) of one-half (1/2) of the 3% working interest, less production costs, retained by Launius pursuant to the farmout agreement from Coquina. That working interest will be figured from July 7, *580 1983, the last date before his death that Launius could have transferred to Wilmena one-half (1/2) of the 3% working interest.

6) Accounting

Santa Fe and Shields will produce an accounting of all funds paid and held in suspense attributable to the overriding royalty and the working interest.

7) Punitive Damages

Under Tideway Oil Programs v. Serio, 431 So.2d 454 (Miss. 1983), a chancery court may award punitive damages. This case, under Snowden v. Osborne, 269 So.2d 858 (Miss. 1972), provides the facts allowing for punitive damages in the amount of $40,000.
From these findings and the judgment of the chancery court, Wilmena appeals the judgment against her as well as the dismissal of Jacobs, Smith and Tri-M Petroleum Company. Kleinpeter also appeals his dismissal.
We affirm as to all aspects except for punitive damages awarded Clyde Whittington against Wilmena in the sum of $40,000  which we reverse and render.

IV.

DISCUSSION

Wilmena's Appeal

A.

The Chancery Court Erred in Its Rulings On the Admissibility of Evidence Under § 13-1-7, Miss. Code Ann. (1972)
In her first assignment of error, Wilmena argues that the lower court improperly applied the Dead Man Statute to her testimony as such testimony touched upon her cross-claim against the Estate of Edward B. Launius. Wilmena's role in this suit concerns two distinct and separate causes of action. One is her defense against the claim of Clyde; the other is her cross-claim against the Estate of Launius and the joint venture partners of Launius. Before any witnesses were called in the suit, counsel for Launius' Estate invoked the Dead Man Statute as to any witnesses testifying concerning their direct claim against the Launius Estate. The trial judge agreed that neither Clyde nor Wilmena would be competent to testify as to any direct claim each had against the Estate of Launius. However, the chancellor allowed all testimony to be taken with the reservation that he would "block out" incompetent testimony from Clyde and Wilmena as it might pertain to the Launius Estate. No one is challenging the statute's application to Clyde on this appeal.
Miss. Code Ann. § 13-1-7 provides in part that:
A person shall not testify as a witness to establish his own claim or defense against the estate of a deceased person, which originated during the lifetime of such deceased person, or to establish any claim he has transferred since the death of such decedent.
This statute was effectively done away with under the general rule of competency promulgated by M.R.E. 601. However, the Mississippi Rules of Evidence became effective January 1, 1986, three months after this case was tried. Therefore, the statute is applicable to this case.
Wilmena first argues that because Clyde called her as an adverse witness, Clyde waived her incompetency. This argument is misplaced. The privilege of objecting to Wilmena's testimony belonged to the Estate of Launius, not to Clyde. Furthermore, the Estate of Launius did not object to Wilmena's testimony as to Clyde's claim, but only as to Wilmena's cross-claim and Clyde's claim against the Estate. Anything that Wilmena testified to in defense of Clyde's claim did not come under the prohibitions of the Dead Man Statute. Furthermore, the chancellor did not block out her testimony as it concerned Clyde's claim.
As to Wilmena's testimony concerning her own claim against Launius' Estate, this Court has continuously upheld the application of the Dead Man Statute to such cases, with some exceptions. In Rosetti v. Stein, 272 So.2d 633, 634 (Miss. 1973), this Court stated:

*581 In applying this rule we have continuously held that a witness will be incompetent and disqualified only when the claim is a direct one either for or against the estate of the deceased and not to indirect or inconsequential claims.
Accord, Poole v. McCarty, 240 Miss. 341, 347, 127 So.2d 398, 401 (1961). Further, this Court said in Bourn v. Bourn, 375 So.2d 421, 424 (Miss. 1979), citing Jacks v. Bridewell, 51 Miss. 881, 888 (1876):
[t]herefore, any "right" asserted against real or personal property left by a deceased person, as accrued to the party by virtue of a dealing between him and such person since deceased, renders the person asserting it incompetent as a witness to maintain in his own behalf such assertion of right.
Accord, Jackson v. Smith, 68 Miss. 53, 54, 8 So. 258 (1890). It is clear that Wilmena asserts a direct claim against Launius' Estate when she alleges that she is entitled to one-half (1/2) of any profits in working interest obtained by Launius, as well as one-sixteenth (1/16) overriding royalty pursuant to their side-letter agreement. The chancellor correctly applied the Dead Man Statute to her testimony that touched upon her claim against the Estate.
As to any exceptions to the Dead Man Statute, there seem to be none that apply to Wilmena. In Birchette v. Hundermark, 145 Miss. 683, 694, 110 So. 237, 238 (1926), this Court pointed out that the statute's "protection of a party against whom a claim against the estate of a decedent is or may be asserted [here Weeks, Administrator, C.T.A.], may be waived, and is waived as to a particular witness having such a claim when he himself introduces and examines the witness." See also Manning v. Hammond, 234 Miss. 299, 306, 106 So.2d 51, 55 (1958). Likewise, taking the deposition of, or serving interrogatories upon, a witness who is incompetent under the Dead Man Statute "is the equivalent of calling such a person as a witness, and is a waiver of the witness's incompetency." Peterman v. Peterman, 447 So.2d 126, 128 (Miss. 1984); Rand v. Moore, 414 So.2d 885, 886 (Miss. 1982); Lipson v. Lipson, 183 So.2d 900, 906 (Miss. 1966). Since Weeks, Administrator C.T.A. for Launius' Estate, did not call Wilmena as a witness, did not cross-examine her, did not serve any interrogatories upon her, and did not depose her, Wilmena's incompetency as a witness against the Estate was not waived.
Wilmena argues further, however, that because the Estate called expert witness Allen Jackson, a professional geologist with qualifications, experience, and background similar to the deceased Launius, the Estate "resurrected Launius from the grave," such that Wilmena's incompetency to testify was waived. Wilmena claims that Jackson testified about the reasons Launius acted as he did with regard to Wilmena's lease, just as if Launius were alive and testifying. Again, the argument is misplaced. Allen Jackson was not an incompetent witness under the prohibition of the Dead Man Statute. He had no claim against the Estate and was not a party to the litigation. He testified as to the usual practices in the oil and gas industry and gave expert opinions as to circumstances surrounding the development of the Whittington wells. He was not allowed to speculate as to what Launius did or thought; contrary to Wilmena's allegations, Jackson did not "resurrect" Launius from the grave. The purpose of the Dead Man Statute was stated in the very early case of Duncan v. Gerdine, 59 Miss. 550, 557 (1882):
It is not what the witness testifies to that makes him competent or incompetent under the statute, but it is the fact that the controversy is between the living and the dead; and the silence which death has imposed on the one the law imposes on the other....
Since Jackson had no controversy with Launius, he was competent to give his expert opinion. Since he was not incompetent to testify under the Dead Man Statute, the Estate did not waive Wilmena's incompetency by calling him as a witness.
Wilmena's final argument is centered around the case of Stennis v. Stennis, 218 So.2d 716 (Miss. 1969). She uses the case for the argument that where a factual situation *582 exists that will cause an inference or conclusion that certain events took place, then a claimant as to the Estate can testify as to what actually happened to rebut the inference. Unfortunately, the Stennis case did not deal with the Dead Man Statute, nor did it deal with a direct claim against an estate. The case explains an exception to the hearsay rule whereby the state of mind of a declarant can be shown by statements to a third party. This argument is beside the point and the Stennis case is not applicable to this issue.
Wilmena complains that the application of the Dead Man Statute to her testimony concerning two findings by the lower court produced an erroneous result. First is the lower court's finding that the second side-letter agreement is binding and supersedes the first. In so finding, the lower court looked only to the two agreements which were introduced into evidence by stipulation of all parties. The court found that Mrs. Whittington signed the second letter agreement, but was unable to say under what circumstances she signed it since Wilmena's testimony that Launius tricked her into signing it was incompetent against the Estate. It should be pointed out, however, that Wilmena's statement that she was tricked into signing it was the only evidence, competent or not, that she did not willingly sign it. Since Launius' lips were sealed by death, and since Wilmena's signature appeared on the second letter agreement, a fact to which she admitted, it seems the chancellor reached the proper result on this issue, even if her testimony had been competent.
The other area of testimony involves Wilmena's claim that she bought the 5% overriding royalty for $25,000 from Launius, and that it was not assigned to her to fulfill the second letter agreement. The lower court said of this claim:
This is a most unusual claim in view of the fact that under either agreement, Mrs. Whittington was entitled to receive at least 5% overriding royalty. There is no question that she borrowed the sum from Mr. Ed Lawson, a highly respected citizen of the county, and gave a promissory note to evidence that. Further, there is no question that she repaid that obligation with $25,000 received from Mr. Baker. The only question is her using that money to pay Mr. Launius. Her testimony to that effect is not competent because of the Dead Man Statute, and there is no other competent evidence to establish that payment.
But then, the judge continued to say:
It is simply beyond belief and inconceivable that in such a situation she paid Mr. Launius $25,000 cash for an interest that she was already entitled to, and obtained no receipt to show payment.
It appears to this Court that the chancellor, having heard all of the testimony, "blocked out" Wilmena's testimony on this issue as to the Estate, but then turned around and considered the credibility of her claim as well. As the trier of fact, the chancellor made a logical finding, one this Court should not disturb, especially in light of the fact that no documents were found in Launius' files to evidence that he received $25,000 for the overriding royalty.

B.

The Chancery Court Erred in Awarding Punitive Damages in the Amount of $40,000
Wilmena argues two points under this assignment of error. First, she argues that there was no proof that she intentionally withheld Clyde's share of the bonus payment because she had no bonus to share. She presses this point under the theory that she purchased the 5% overriding royalty from Launius rather than receiving the assignment as her entitlement under the side-letter agreement. However, this argument must fall in light of the lower court's finding that Wilmena did not purchase the overriding royalty. The lower court further found that Wilmena did not meet her obligation of good faith and fair dealing to the owner of the non-executive rights under the lease, Clyde. Wilmena breached her duty in this regard by deliberately concealing her entitlement to a bonus for the execution of the lease by Launius by entering into an unrecorded *583 side-letter agreement. Further, when Wilmena received her 5% overriding royalty, she immediately sold it to Baker and Newman without first assigning to Clyde his portion of the bonus. Having made these findings, the chancellor then found that Clyde was entitled to one-fourth (1/4) of the 5% overriding royalty, the production from that portion of the overriding royalty from the date Wilmena acquired the overriding royalty, and to one-fourth (1/4) of one-half (1/2) of the 3% working interest, less production costs, which Launius acquired in the farmout from Coquina to Jacobs and the joint venture.
Having assessed Clyde's actual damages, the chancellor moved on to consider the appropriateness of punitive damages. He first acknowledged, correctly, that under Tideway Oil Programs v. Serio, 431 So.2d 454 (Miss. 1983), the chancery courts may award punitive damages in an appropriate case. He then stated, "It would be difficult to conceive of a set of facts and circumstances where an award of punitive damages would be more justified than those before the court." He awarded punitive damages in the amount of $40,000.
As to the conduct for which punitive damages are appropriate, this Court has stated: "[t]here are two circumstances wherein a party may be assessed with punitive damages: where the evidence establishes that this party acted with malice and where the evidence shows that the defendant acted with gross negligence or reckless disregard for the rights of others." Scott v. Transport Indemnity Co., 513 So.2d 889, 896 (Miss. 1987). See also Weems v. American Security Insurance Co., 486 So.2d 1222, 1226 (Miss. 1986); Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481, 485 (Miss. 1972); Seals v. St. Regis Paper Co., 236 So.2d 388, 392 (Miss. 1970); Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 150, 141 So.2d 226, 233 (Miss. 1962).
The question in this case, then, is whether or not Wilmena's conduct amounted to a willful and intentional wrong against Clyde or whether or not she acted in reckless disregard to Clyde's rights. In finding that punitive damages were appropriate in this case, the chancellor reasoned:
There was substantial testimony concerning the benefits which Mrs. Whittington has received from the numerous oil wells which have been successfully completed on this property with the probability that more will be completed, as well as the substantial sums received from overriding royalty. In receiving these benefits no thought was given to her responsibility to plaintiffs or their rights.
For these wrongs, the court determined that Wilmena should be "severely punished." Under this Court's now familiar scope of review of a chancellor's findings, this Court will not disturb the finding that this is an appropriate case for award of punitive damages, for there is substantial credible evidence on the record that Wilmena willfully concealed her bonus entitlement from Clyde, and denied Clyde his rightful share of the bonus. See, e.g., Dunaway v. Bushin, 498 So.2d 1218, 1221 (Miss. 1986); Richardson v. Riley, 355 So.2d 667 (Miss. 1978).
As to the appropriate amount of punitive damages to assess for the conduct, this Court has set out various considerations, considerations which we synthesized, as follows in Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254 (Miss. 1985), aff'd, ___ U.S. ___, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988):
1) Such amount as is necessary for the punishment of the wrongdoing of the defendant and deterring the defendant from similar conduct in the future, Standard Life Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1977);
2) Such amount as is reasonably necessary to make an example of the defendant so that others may be deterred from the commission of similar offenses. Reserve Life Insurance Co. v. McGee, 444 So.2d 803, 808 (Miss. 1983); T.C.L., Inc. v. LaCoste, 431 So.2d 918, 923 (Miss. 1983); Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983); Snowden v. Osborne, 269 So.2d 858, 860 (Miss. 1972); and

*584 3) The pecuniary ability or the financial worth of the defendant. Collins v. Black, 380 So.2d 241, 244 (Miss. 1980); Allen v. Ritter, 235 So.2d 253, 256 (Miss. 1970); Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1978); Jones v. Carter, 192 Miss. 603, 610, 7 So.2d 519 (1942).
Id. at 278.
The chancellor awarded punitive damages of $40,000 "based upon the testimony and the financial resources of the defendant as reflected in the record... ." The record indeed reflects that Wilmena received $8,800 for sale of part of her 5% overriding royalty acres to Newman; $100,105.44 from sale of another part of the 5% overriding royalty acres to Baker; $685,000 for sale of her land and one-half of her minerals to Kleinpeter ($100,000 in cash, $179,000 payable in 15 annual installments at a 7% per annum interest rate, and assumption of a $406,000 secured debt against the land); $100,000 on her landowners' royalty reserved in the lease; and funds held in suspense by Shield Resources of $30,819.45 and by Santa Fe of $105,537.25. While $40,000 may be a reasonable amount for the punishment of this wrongdoing and for deterring this defendant from similar future conduct, and while it may be a reasonable amount to serve as an example and deterrent for others, these financial resources relied upon by the chancellor reflect only part of Wilmena's financial picture. Showing assets is only a part of the equation in arriving at "net worth" or "financial worth" of an individual or legal entity. The defendant's proof failed to adequately establish her net worth  assets minus liabilities  so as to serve as a measure for the Court to consider in arriving at a sum to award as punishment in this case. T.C.L., Inc. v. Lacoste, 431 So.2d 918, 923 (Miss. 1983). See also Employers Mutual Casualty Co. v. Tompkins, 490 So.2d 897, 908 (Miss. 1986); Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d at 279; First American National Bank of Iuka v. Mitchell, 359 So.2d 1376, 1379 (Miss. 1978); Snowden v. Osborne, 269 So.2d 858, 861 (Miss. 1972). Therefore, we reverse and render on this point.

C.

The Chancery Court Erred in Its Holding As to the Liability of the Estate of Edward B. Launius and Launius' Partners, Robert R. Jacobs and Donald Smith

1. The Liability of the Estate of Launius

The lower court predicated its judgment as to the liability of the Launius Estate upon two factual findings: (1) the second side-letter agreement superseded the first because the parties agreed that it would and (2) the assignment to Wilmena of the 5% overriding royalty was in partial fulfillment of the second side-letter agreement. Wilmena, of course, argues that these two factual findings were erroneous and further argues that under the terms of the first side letter agreement the Estate of Launius is liable to her for 6.25% overriding royalty, one-half of 5% working interest (rather than 3% because Launius' assignment of 2% for legal fees had nothing to do with promoting the lease), one-half of the $86,000-profits the partnership netted (rather than one-half of the $35,000-share Launius netted as a partner), and one-half of the $25,000 Launius received for sale of the lease to Coquina. Accepting the lower court's findings on these two factual issues, which we must under our articulated scope of review, it should be remembered that the second side-letter agreement removed the requirement that Launius share any profits in promoting the lease; in fact, once he sold the lease to Coquina Launius could no longer promote it. Launius did assign Wilmena the 5% overriding royalty, which she sold for a tidy sum of money. The only part of the agreement Launius did not fulfill was assignment of one-half of his working interest. The 2% working interest assigned to Tri-M did cancel $700 worth of legal fees, but contrary to Wilmena's contention, Tri-M also had to pay 2% of the completion costs on the first well and 2% of the development costs on the additional wells drilled. In other words, Tri-M's 2% was part of promoting the farmout in order to meet completion costs. Apparently, Launius did *585 not have enough money for completion costs on the entire 5% of the working interest, but only for 3%. Therefore, the chancellor correctly found that Wilmena was entitled to one-half of 3% of the working interest and that the rest of the second side-letter agreement had been fulfilled.
Wilmena argues further that Launius fraudulently concealed profits, overriding royalty, and working interest he obtained from the lease, as well as tricking her into signing the second letter agreement. The elements of fraud are well established: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; (9) his consequent and proximate injury. See, e.g., Martin v. Winfield, 455 So.2d 762, 764 (Miss. 1984); Hamilton v. McGill, 352 So.2d 825, 831 (Miss. 1977); Crawford v. Smith Brothers Lumber Co., 274 So.2d 675, 678 (Miss. 1973). It is likewise well established that fraud is never presumed but must be proven by clear and convincing evidence. Martin v. Winfield, 455 So.2d at 764; Gulf National Bank v. Wallace, 394 So.2d 864, 865 (Miss. 1981); Clement v. R.L. Burns Corp., 373 So.2d 790, 795 (Miss. 1979); Hamilton v. McGill, 352 So.2d at 831; Crawford v. Smith Bros. Lumber Co., Inc., 274 So.2d at 677. Furthermore, "fraud is essentially a question of fact." Martin v. Winfield, 455 So.2d at 764. The only evidence offered that Launius fraudulently concealed his promotional dealings with the lease and tricked Wilmena into signing the second letter agreement was Wilmena's testimony. Because of the Dead Man Statute, her testimony was incompetent on these issues. Even if it had been competent testimony, such evidence surely does not rise to the level of clear and convincing. Furthermore, the unrebutted testimony of Jacobs, Smith and Jackson evidence that Launius did nothing out of the ordinary as far as the usual procedures in the oil and gas industry in dealing with the lease and reaching the point that several producing wells were drilled on the Whittington acreage. In fact, Launius' wheelings and dealings with the lease made Wilmena a rich woman. Fraud has not been proven by clear and convincing evidence, and the chancellor correctly found that the extent of the Estate's liability to Wilmena was one-half of the 3% working interest. This assignment of error as to Launius' Estate is without merit.

2. The Liability of Jacobs and Smith

Wilmena seeks to make Launius' joint venture partners, Jacobs and Smith, liable for a 6.25% overriding royalty, one-half of $86,000 in profits, and one-half of the 12.5% working interest, or at least the portion that Launius' Estate cannot pay. Again, these are the terms of the first side-letter agreement with Launius; under the second side-letter agreement the requirement to share profits was dropped. Also, Launius assigned Wilmena the 5% overriding royalty; therefore, all terms of the second agreement were fulfilled except for one-half of the working interest. The question becomes whether or not Jacobs and Smith are liable for their share of one-half of the 12.5% working interest retained by the joint venture in the farmout agreement from Coquina.
Wilmena seeks to charge the joint venture partnership with knowledge of the side-letter agreement under Miss. Code Ann. § 79-12-23 (Cumm.Supp. 1987), which states:
Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.
In Hults v. Tillman, 480 So.2d 1134 (Miss. 1985), this Court stated that the Uniform Partnership Act, adopted by this state in 1976 and embodied in Miss. Code Ann. *586 § 79-12-1, et seq., applies to joint venture partnerships such as the Launius/Jacobs/Smith partnership. As the Hults opinion states, "[a] joint venture might be characterized as a single shot partnership," Hults at 1143, whereby the joint venturers undertake a single project for profit. Hults at 1142. See also Sample v. Romine 193 Miss. 706, 8 So.2d 257 (1942). The partnership among Jacobs, Smith and Launius set out specifically that they were to promote the drilling of an oil well on the Whittington acres and sell the interest therein. It should also be remembered that Launius owned no more interest in the "Wilmena" lease at this time except for a 7.5% overriding royalty, having sold the lease to Coquina. Out of this overriding royalty, he owed Wilmena 5%, leaving himself only 2.5%. He brought 2.5% into the partnership, not 7.5%, even though he had not yet assigned 5% to Wilmena. Obviously, Launius knew he owed 5% overriding royalty to Wilmena and, therefore, held it for her.
When the partnership was formed, the uncontradicted evidence shows that Jacobs knew nothing about the side-letter agreement between Launius and Wilmena and, in fact, knew nothing about it until after Launius died and he found it in Launius' files. All he knew was that Launius held a 2.5% overriding royalty in the Coquina lease from somewhere. Jacobs acquired knowledge of the agreement after the joint venture was terminated, that being after Jacobs had earned all the interest from Coquina under the farmout and assigned interest to all who bought into the farmout. The "single-shot partnership" was already at an end. Wilmena thus seeks to hold Jacobs and Smith to knowledge of an agreement between her and Launius executed eight years before the partnership was formed, and about which neither Jacobs and Smith knew anything until after the joint venture ended. Furthermore, obtaining the lease was outside the scope of the joint venture. Launius had already obtained the lease eight years before and sold it to Coquina. The obligations of the side-letter agreement were clearly undertaken by Launius alone, and he did not bring those obligations into the joint venture. Jacobs and Smith, then, cannot be charged with knowledge of Launius' agreement because that agreement did not relate to partnership affairs, as required under § 79-12-23. See 59(a) AmJur2d Partnership § 252; 68 C.J.S. Partnership § 175, and cases collected therein. The chancellor was correct when he found that Jacobs and Smith could not be held liable to Wilmena for something Launius agreed to eight years before. This assignment of error is without merit.

V.

Kleinpeter's Appeal

A.

The Trial Court's Decision Dismissing the Cross-Claim of Thomas G. Kleinpeter Against Wilmena W. Whittington was Contrary to Law and Against the Overwhelming Weight of the Evidence

B.

The Trial Court Erred in Overruling Appellant's Motion for Summary Judgment, There Having Existed No Issue of Material Fact Between Thomas G. Kleinpeter and Wilmena W. Whittington and Mr. Kleinpeter Having Been Entitled to Judgment as a Matter of Law
Under both assignments of error, Mr. Kleinpeter argues the same thing  that as a matter of law he is entitled to one-half of the bonus Launius promised Wilmena in the side-letter agreement because in 1977 Wilmena sold him half her mineral estate. The chronology of events was such that Wilmena leased the entire mineral estate to Launius in 1975 and entered into the first side-letter agreement. In 1977 she sold the entire surface and one-half the mineral estate to Kleinpeter. It should be remembered that the lease from Wilmena to Launius, which stated that Wilmena reserved a one-eighth royalty and that the bonus for execution of the lease was $10, was recorded in Amite County. The side-letter agreement was unrecorded. When Kleinpeter bought the surface and one-half of the minerals in 1977, he did not realize that the *587 minerals were under lease, even though the warranty deed stated "subject to all prior mineral rights and royalty transfers," and even though the lease was recorded. Kleinpeter testified that he made no title search before he purchased the land and one-half the minerals from Wilmena.
Kleinpeter frames the issue, thus: does a deferred bonus pursuant to a prior existing lease which accrues subsequent to a conveyance of all or part of the mineral estate, entitle the subsequent grantee to a proportionate share of the bonus? Apparently, this is a novel question in Mississippi. In deciding the issue, the chancellor referred to two cases from other states. In the Oklahoma case of Local Federal Savings & Loan Association of Oklahoma City v. Eckroat, 186 Ok. 660, 662, 100 P.2d 261, 263 (1940), that Court stated:
We therefore hold that a clause in an oil and gas lease providing that the lessor shall receive as an additional consideration the proceeds to be derived from the sale of a certain portion of the oil reserved to the lessee as the same is produced, constitutes a covenant running with the land and the lessor's deed conveying the leased premises will pass benefits not yet due or the burdens of such covenant to his grantee, in the absence of a reservation thereof.
A Texas case, Minchen v. Fields, 162 Tex. 73, 75, 345 S.W.2d 282, 284 (1961), held that an oil payment reserved in an oil and gas lease by the lessor was held to be a bonus payable on an acreage basis to such persons that owned the premises at the time the payment accrued. See also Wright v. Carter Oil Co., 97 Okla. 46, 223 P. 835 (1923) (subsequent conveyance of one-half mineral interest subject to existing lease, conveyed one-half rentals to grantee under such a clause in the lease, unless specifically reserved); Harris v. Currie, 142 Tex. 93, 176 S.W.2d 302 (1944) (if owner sells land already leased, the purchaser is entitled to rent on lease money accruing after his purchase); Alfrey v. Ellington, 285 S.W.2d 383, 387 (Tex. App. 1955) ("a general warranty deed to all grantors' interest in minerals, in the absence of an intention to the contrary manifested by the language of the deed, conveys to the grantee an oil payment reserved in a prior lease"); 3 Williams and Meyers Oil and Gas Law § 666.1 (1986); 1 Williams and Meyers Oil and Gas Law § 301 (1986); Hemmingway, The Law of Oil and Gas § 9.1 (2d Edition 1983). All of these cases and treatises, however, deal with deferred bonus payments which appear on the face of the lease. In the present case, the deferred bonus payment did not appear on the face of the lease and was specifically not part of Wilmena's and Kleinpeter's bargain.
While this is an interesting  albeit a thorny  issue, the chancellor rested his finding that Kleinpeter was not entitled to one-half of Wilmena's share of the bonus on the fact that the warranty deed stated "subject to all prior mineral rights and royalty transfers." The chancellor's decision was appropriate in these circumstances. Had Kleinpeter done a title search, or even inquired into the reason for the language in the warranty deed referring to previous mineral rights and royalty transfers, he could have found out the minerals were leased and he could have pursued the particulars of the lease with Wilmena before purchasing. At that point, had Wilmena concealed the particulars from him, other considerations might weigh into a decision on this issue. However, under these circumstances, where the warranty deed specifically stated that the conveyance was subject to all prior mineral rights and royalty transfers, where Kleinpeter failed to do a title search to find out whether or not the minerals were leased and under what conditions, and where Kleinpeter neither bargained for nor paid for any rights to Wilmena's bonus, we affirm the chancellor's judgment. These assignments of error are without merit.

VI.

CONCLUSION
Finding the chancellor was correct in awarding Clyde Whittington et ux. the compensatory damages, we affirm thereasto. Finding insufficient proof of net worth, we reverse and render here so much of that *588 decree dated March 5, 1986, that awards $40,000 punitive damages against Wilmena W. Whittington and payable to Clyde Whittington et ux.
We affirm the chancellor's findings as to the cross-appeal of Wilmena W. Whittington against the Estate of Launius, Jacobs, Smith, and Tri-M Petroleum Company.
We likewise affirm the chancellor's findings as to the cross-appeal of Thomas Kleinpeter against Wilmena W. Whittington.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
ROBERTSON, J., concurs by separate written opinion.
SULLIVAN, J., and HAWKINS, P.J., dissent by separate written opinion.
ROBERTSON, Justice, concurring:
I find myself in uneasy agreement with our decision on rehearing to reverse and render on the matter of punitive damages. Clyde's proof of Wilmena's net worth is certainly lacking, but I am hard pressed to say that his proof on quantum is insufficient as a matter of law.[1] I see safer ground for our action.
Wilmena's conduct is hardly commendable. She concealed from Clyde her  and his  bonus entitlement, but insofar as I can see she never withheld from Clyde a penny that was rightfully his. Had Wilmena been pocketing bundles of bonus during the years she kept the bonus agreement secret from Clyde we would have a horse of a different color. Gardner v. Jones, 464 So.2d 1144, 1148 (Miss. 1985) admonishes
Punitive damages do not follow as the day the night every finding that a defendant has been guilty of fraud. Though fraud is frequently an ingredient of an award of punitive damages, it is clear from our cases that more is required.
Wilmena hid something she should have told Clyde about, but she caused him no harm. Damnum absque injuria, the old timers call it. I would hold Clyde's proof on the liability phase of his punitive damages claim inadequate as a matter of law. I join therefore our judgment on point.
SULLIVAN, Justice, dissenting:
I concur in most of what the majority says except that I dissent from the majority's disposition of assignment IV, B, of Wilmena's appeal. Therein, the majority candidly acknowledges that the circumstances of this case support an award of punitive damages. (Majority op. at 583) In its next breath, however, the majority holds that the amount awarded by the chancellor ($40,000.00) was erroneous because the "proof failed to adequately establish [Wilmena's] net worth  assets minus liabilities  so as to serve as a measure for the court to consider in arriving at a sum to award as punishment in this case." (Majority op. at 584) Consequently, the majority reverses and renders on this point. (Majority op. at 584)
This logic escapes me. I agree that a complete picture of net worth has not been established, but to render on the issue is to deny Clyde the opportunity to which I feel he is entitled; that is, the opportunity on remand to offer adequate proof of Wilmena's net worth "so as to serve as a measure for the court to consider in arriving at a sum to award as punishment in this case." T.C.L., Inc. v. Lacoste, 431 So.2d 918, 923 (Miss. 1983). Furthermore, inadequate proof of net worth leaves us without a "way to measure the correctness of the punitive damage award ..." First American National Bank of Iuka v. Mitchell, 359 So.2d 1376, 1381 (Miss. 1978).
*589 In dissent in Mutual Life Insurance Company v. Estate of Wesson, 517 So.2d 521, 540 (Miss. 1987), Justice Anderson, joined by Presiding Justice Dan Lee and Justice Sullivan, noted that the practice of this Court has been to "reverse and remand, not substitute judgment" where the award of punitive damages is considered excessive, citing First American, supra. Indeed, this has been the practice of this Court, a practice apparently ignored by the majority today.
In First American National Bank of Iuka, supra, this exact problem was presented, and in response we said:
Although punitive damages may properly be awarded against FANB due to the fraudulent acts of its officer or agent, $250,000 is so grossly excessive that the amount is shocking. Not only is the record deficient and unclear as to proof of actual damages above $35,000, no proffer was made of adequate proof of the net worth of financial condition of FANB. Snowden v. Osborne, 269 So.2d 858 (Miss. 1972). Absent some proper showing of the net worth or financial condition of FANB, we have no way to measure the correctness of the punitive damage award ($250,000) which on its face seems totally unrealistic upon the record. Accordingly, remand is necessary for retrial on the sole issue of damages; actual and punitive. (Emphasis added).
359 So.2d at 1381.
In Gaylord's of Meridian, Inc. v. Sicard, 384 So.2d 1042 (Miss. 1980), we again responded to this exact problem by saying:
The proof on the issue of punitive damages was to the effect that Gaylord's had eighteen (18) or twenty (20) other stores. There was no evidence relating to the financial worth of Gaylord's and there was no guide whereby the jury could determine punitive damages. In First American National Bank of Iuka v. Mitchell, 359 So.2d 1376 (Miss. 1978), the Court held that without a showing of the net worth or financial condition of the defendant, there was no way to measure the punitive damage award.
We are of the opinion that the verdict of the jury as to damages is not sustained by the evidence and that the verdict of the jury is contrary to the overwhelming weight of the evidence on the issue of damages, both actual and punitive, and that the judgment of the lower court should be, and it is, reversed and remanded for a new trial on the issue of damages alone.
384 So.2d at 1045-46.
In my opinion, the majority strays from the beaten path, and impermissibly substitutes its judgment on the issue of punitive damages. Therefore, I would reverse and remand for a new trial solely on the issue of punitive damages so that the net worth (assets minus liabilities) of Wilmena can be "adequately establish[ed] ... so as to serve as a measure for the court to consider in arriving at a sum to award as punishment in this case."
HAWKINS, P.J., joins in this dissent.
NOTES
[1] The dissent offers a mistaken view, suggesting, as it does, that a new trial on (punitive) damages should follow the majority's holding Clyde's proof inadequate. A litigant is entitled to but one bite at the damages apple. If, as the majority holds, Clyde's proof of Wilmena's net worth sinks his ship, that ends the matter. I know of no law directing that a plaintiff who misses with his first shot at proving damages should be given a second shot. If we have cases suggesting such, they may be safely said out in left field.