599 So.2d 938 (1992)
SINGING RIVER MALL COMPANY, a Partnership
v.
MARK FIELDS, INC., a Mississippi Corporation.
No. 07-CA-59493.
Supreme Court of Mississippi.
April 1, 1992.
Rehearing Denied June 24, 1992.
*940 Vincent J. Castigliola, Jr., Bryan Nelson Allen Schroeder & Backstrom, Pascagoula, for appellant.
Robert A. Pritchard, Pritchard & Chapman, Henry P. Pate, Pascagoula, John W. Chapman, Brandon, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and BANKS, JJ.
PRATHER, Justice, for the court:

I.

INTRODUCTION
This case for past-due rent arose on the appeal of the plaintiff-landlord, Singing River Mall Co., from the October 13, 1988, judgment of the Circuit Court of Jackson County in favor of the defendant-tenant, Mark Fields, Inc. The mall timely appeals the judgment of $25,000 in actual damages, raising the following questions:
A. Did the mall improperly act as a public utility?
1. Did the circuit court have subject-matter jurisdiction?
2. Did the trial court commit reversible error when it instructed the jury that it could find actual damages based on the mall's acting as a public utility?
B. Did the mall fraudulently overcharge Fields, thus entitling Fields to a setoff counterclaim against its unpaid rent?
1. Did the store assert its setoff counterclaim outside the statutory limitation period?
2. Did the mall commit fraud?
C. Did a March 1986 agreement bind the mall?
D. Did the mall's acceptance of Field's reduced rent payments constitute accord and satisfaction?
This Court reverses, partially renders, and partially remands for further proceedings not inconsistent with this opinion.

II.

BACKGROUND
Lyle Klasky is a major shareholder and officer of Mark Fields, Inc., hereinafter referred to as "Fields," which owns the Brumfields store in Singing River Mall. Singing River Mall is owned by O'Connor Realty Investors Limited Partnership and is managed by O'Connor Management Inc. of Dallas. Sometime in 1979, Fields leased store space in Singing River Mall, which lease included the mall's agreement to provide *941 electricity at the cost the tenant would have paid a utility company. The lease did not expressly indicate that the mall would redistribute electricity at a price differing from the price it paid the utility company. The tenant's cost included the leased space and Field's pro rata share for heating or cooling the common areas of the mall.
Before Fields opened, it installed a lighting and air conditioning system based on the advice of its electrical engineers. What quickly ensued, described in more detail below, was a troubled relationship between landlord and tenant over the matter of electricity bills. During the time preceding this trial, the Fields store consistently complained that the mall overcharged for electricity. Several billing verifications and electricity-usage audits failed to bring the parties to agreement. As a consequence, Fields deducted a substantial amount from its rent based on an expert, but disputed, determination of usage.
On January 15, 1987, Singing River Mall filed a complaint in the Circuit Court of Jackson County alleging that Fields had failed to pay a substantial amount of rent. Pursuant to the lease agreement, Singing River Mall also asked for attorney's fees. Fields, in its answer, denied any allegations of delinquency and alleged that it had paid all that it owed. Fields also alleged (1) a setoff due it because of allegedly excessive electricity charges by Singing River Mall, (2) accord and satisfaction, and (3) a defense that the mall improperly acted as a public utility by allegedly overcharging the tenant for electricity. Also, Fields claimed a credit and damages due to fraud. As for actual damages, Fields claimed that many customers had commented to store employees about the lawsuit.
On March 14, 1988, trial began. On April 20, the jury found for the defendant-tenant, Fields, and awarded $25,000 actual damages. The mall appeals.

III.

DISCUSSION

A. Did the mall improperly act as a public utility?
On appeal, Singing River Mall challenges the court's subject-matter jurisdiction on the utility issue, complaining that the trial court constituted an improper forum in which to adjudicate whether the mall improperly acted as a public utility. Further, the mall contends that the trial court erred in instructing the jury that it could award actual damages for the mall's having improperly operated as a public utility.

1. Did the circuit court have subject-matter jurisdiction under Mississippi statutes and did the store have standing arising out of some actual harm?
In order to provide electricity to tenants, the mall bought electricity from the Singing River Electric Power Association ("EPA"). While the mall paid a discounted industrial rate for the electricity, the lease called for the mall to charge the tenant the same rate it would have paid the utility company directly. At trial, the mall stipulated that nobody affiliated with the mall qualifies as a public utility in the State of Mississippi.
The mall engaged Value Engineering Inc. of Dallas ("VEI"), an electrical engineering firm, to compute its monthly electricity charges based on Electric Power Association (EPA) rates. VEI uses this manner of calculation and billing for eighty-seven client malls in thirty-five states. The practice is variously termed "tenant environmental charge," "utility redistribution," "energy redistribution," and "master metering." Mr. Hosey Chambers of VEI testified that this method of billing is accepted as industry standard. He explained that the master metering method lowers developer construction costs.
Considering applicable law, subject-matter jurisdiction defines a court's authority "to entertain and proceed with a case." Bullock v. Roadway Express, Inc., 548 So.2d 1306, 1308 (Miss. 1989); see also Petters v. Petters, 560 So.2d 722, 723 (Miss. 1990). For circuit courts, that authority arises from the constitutional provision stating that circuit courts have "original jurisdiction in all matters civil and criminal *942 in this state not vested by this Constitution in some other court... ." Miss. Const. art. 6, § 156. In reviewing a subject-matter jurisdiction challenge to the Constitution's grant of authority, the Supreme Court looks at the type of case by examining the nature of the controversy and the relief sought. Hood v. Dep't of Wildlife Conservation, 571 So.2d 263, 266 (Miss. 1990); see also Penrod Drilling Co. v. Bounds, 433 So.2d 916, 924-25 (Miss. 1983) (Robertson, J., concurring). The question becomes, then, whether Mississippi's laws authorize some body other than a circuit court to entertain and proceed with public utility matters.
In public utility matters, the Public Service Commission has "exclusive original jurisdiction over the intrastate business and property of public utilities." Id. § 77-3-5 (1972)[1]; see also Mississippi Power & Light Co. v. Conerly, 460 So.2d 107, 111 (Miss. 1984). In Mississippi Power Co. v. Goudy, 459 So.2d 257, 267-69 (Miss. 1984), Justice Hawkins, in his concurring opinion, addressed the issue of whether or not a party, having brought an action before the Public Service Commission, could raise a separate constitutional issue in a circuit court. Justice Hawkins acknowledged the commission's authority to decide judicial questions and to pass upon the rights of parties, which decisions could then be appealed to a circuit court. Id. at 268-269 (citing Illinois Central R.R. Co. v. Mississippi Public Serv. Comm'n, 220 Miss. 439, 445, 71 So.2d 176, 177 (1954)). Justice Hawkins also approvingly cited an Arkansas case in which a consumer, without ever seeking commission relief, brought an action in a circuit court. There, the Arkansas Supreme Court ruled that the circuit court did not have concurrent jurisdiction with the public service commission, which offered "a complete and adequate remedy." Id. at 269 (citing Oklahoma Gas & Elec. Co. v. Lankford, 278 Ark. 595, 601, 648 S.W.2d 65, 66 (1983)). Thus, the plain meaning of the Mississippi statute, supported by a persuasive Court interpretation, leads this Court to conclude that only the Mississippi Public Service Commission may initially decide a matter relating to the regulation of intrastate public utility activity.
Therefore, given the nature of the controversy presented and the relief sought by Fields in its counterclaim, this Court holds that this issue presents a matter outside the subject-matter jurisdiction of the circuit court to originally hear. Based on the plain meaning of the public utilities statute, the circuit court had no jurisdiction to decide that the Singing River Mall improperly acted as public utility. The commission's jurisdiction is exclusive, but subject to the appellate process.
Further, in its brief, Fields made no allegation of harm arising from the mall's alleged behavior as a public utility. While the store pointed to the uncontradicted fact that the mall made a profit by buying power at an industrial rate and reselling it at a rate the individual stores would have paid the EPA, Fields stated no grounds for damages. The store's contention that the claim had to be brought as a compulsory counterclaim has no merit; Fields demonstrated no compelling nexus between the alleged harm and the mall's allegedly acting as a utility. The store's argument that the claim had to be heard in a circuit court in order for the store to obtain money damages also fails to persuade: the store is not a private utilities commissioner, deserving of compensation for ferreting out violations.[2] *943 If any harm of overcharging occurred, that counterclaim could have stood on its own, without the necessity of proving a utilities law violation.
The next question, then, is whether the trial court committed reversible error when it submitted the issues of utilities violation and resulting damages to the jury.

2. Did the trial court commit reversible error when it instructed the jury that it could find actual damages based on the mall's having acted as a utility?
In this case, as discussed above, the trial court improperly assumed jurisdiction to hear the issue of whether the mall acted as a public utility. Further, the trial court gave Instruction D-1A, which stated:
[I]f you find from a preponderance of the credible evidence ... that ... [the mall] operated a public utility without having first obtained a certificate of public convenience and necessity from the Mississippi Public Service Commission, ... [that the mall] improperly operated a public service utility, [and that Fields] was injured as a direct and proximate result of the operation of a public service utility by [the mall] and ... [Fields] suffered damages as a direct and proximate result of its injuries, then it is your sworn duty to find for Defendant MARK FIELDS, INC.
If the jury instructions, taken together, properly instruct the jury, this Court's standard of review indicates that no reversible error will lie in the error of one instruction. Detroit Marine Engineering v. McRee, 510 So.2d 462, 467 (Miss. 1987); Laney v. State, 486 So.2d 1242, 1246 (Miss. 1986). This Court assumes jurors follow the instructions given to them by the trial court. Odom v. Roberts, No. 90-CA-0257 (Miss. July 24, 1991) (1991 Westlaw 142142); Parker v. Jones County Community Hosp., 549 So.2d 443, 445-46 (Miss. 1989).
In this case, the court did not properly instruct the jury. The instructions here, taken as a whole, could not cure the harm of the misplaced issue of the mall's status as a utility and alleged resultant damages. The improper jurisdiction and subsequent improper and incurable jury instruction lead this Court to hold that the trial court's misdirection of the jury resulted in a miscarriage of justice and constitutes reversible error. On this issue, the Court reverses and renders.

B. Did the mall fraudulently overcharge Fields, thus entitling Fields to a set-off counterclaim against its unpaid rent?
The mall claims that the trial court erred in allowing the store to claim damages for allegedly fraudulent overcharges which took place prior to the period of rent delinquency. The mall contends that its motion for a directed verdict on the store's fraud counterclaim should have been granted and asserts that Fields should have been barred from raising a setoff defense because the setoff Fields asserted in 1986 arose out of payments made as many as forty-seven months earlier.
The facts of the case reveal a long history of disputes between the parties. Originally, the mall's electrical engineers calculated Fields' electrical usage based upon the blueprints devised by the store. After subsequent audits, the mall periodically issued Fields credits for electricity bills. These credits did not include interest, nor did Klasky request interest. Klasky, over a period of several years, modified the lighting fixtures in Fields in order to reduce electricity consumption.
On March 17, 1986, Gary Ogzewalla, who was the mall's general manager and Jay *944 Keef, Ogzewalla's supervisor, met with Klasky to discuss Field's outstanding balance and electricity bill complaints. The parties agreed that the outstanding receivables would be determined by a mutually agreed-upon third-party engineer, by whose results the parties would abide. Ogzewalla also stated that the parties agreed that, as of April 1, 1986, Fields' electricity bills would be based on a meter installed at the store.
Ogzewalla, in his capacity as mall manager, wrote Klasky on March 19, 1986, to confirm the agreement regarding receivables. Ogzewalla's letter stated, in part:
Pursuant to our conversation of March 17, 1986, the following represents my understanding of our agreement regarding outstanding receivables: ... I will obtain a neutral third party electrical engineer to verify usages in your mall store and in your Pascagoula store... . Each of us will accept the third party findings. If you have been overcharged, a credit will be issued. If the findings show you have underpaid, you will pay any excess amount.
An engineer named West performed the survey. The mall disputed his results, and West eventually concurred with the Mall's criticisms of his report. Klasky, however, preferred West's original conclusions. Based on them, he asserted that the mall owed Fields a $826.25 credit per month for a period of 47 months, totalling $38,861.95. Klasky withheld rent payments until the rent withheld reached the amount of $38,681.95. Klasky resumed paying regular rent in November of 1986 and paid electricity at the original West-calculated rate of $1,985 per month. At trial, both parties introduced the testimony of other experts to support their respective positions.

1. Did the store assert its setoff counterclaim outside the statutory limitation period?
The mall claims that the store's setoff counterclaim should have been barred by a limitation period. A setoff is a counterclaim which the defendant has against the plaintiff, but which is extrinsic to the plaintiff's claim. Black's Law Dictionary 1372 (6th ed. 1990). Regarding limitations for a setoff, the limitation is computed at the time the defendant began the action; the defendant is not barred from using setoff as a defense to a debt if the defendant "held [the setoff] against the debt sued on before [the setoff] was barred." Miss. Code Ann. § 15-1-71 (1972). Generally, the statute of limitations for an action not statutorily specified is six years, Miss. Code Ann. § 15-1-49 (1972), including an action on a written contract, Blodgett v. Pearl River County, 134 Miss. 816, 825-26, 98 So. 227, 228 (1923). An unwritten contract limitation period is three years. Miss. Code Ann. § 15-1-29 (Supp. 1988); see also Hawkins v. Ellis, 168 Miss. 428, 432-33, 151 So. 569, 570 (1934); Blodgett, 134 Miss. at 825-26, 98 So. at 228.
In supporting its argument, the mall cited Hawkins, dealing with an unwritten contract. The overcharges alleged by Fields, however, do not arise under any unwritten contract; Fields' setoff defense implies an action arising under the lease itself. Because the lease constitutes a written contract, the store's fraud claim is subject to a six-year limitation period. This six-year limitation period encompasses any evidence the store presented regarding allegedly fraudulent overcharges dating back to June of 1982. Thus, with no statutory bar, the next question concerns the merits of the store's fraud claim.

2. Did the mall commit fraud?
The mall alleges that the trial court erroneously denied its motion for a directed verdict on the store's fraud counterclaim. In reviewing a motion for directed verdict, this Court may find for the movant only if reasonable people could not have done otherwise; if substantial evidence would lead reasonable people to differing conclusions, the motion may not be granted. Rebelwood, Ltd. v. Hinds County, 544 So.2d 1356, 1368 (Miss. 1989); Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984).
On this issue, the evidence under review concerns fraud. Fraud may not be charged in general terms; it must be *945 pleaded with particularity and may not be inferred or presumed. Brabham v. Brabham, 483 So.2d 341, 342 (Miss. 1986); Miss. R.Civ.P. 9(b) (1988). Further, "[f]raud cannot be predicated upon statements which are promissory in their nature when made and which relate to future actions or conduct." House v. Holloway, 258 So.2d 251, 253 (Miss. 1972). A promise of future conduct may be found fraudulent only if the hearer proves that the speaker intended, at the time of the statement, to induce reliance by speaking a falsehood. House v. Holloway, 258 So.2d 251, 253 (Miss. 1972); 37 C.J.S. Fraud § 11 (1968).
The elements of fraud are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the representation's truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. Whittington v. Whittington, 535 So.2d 573, 585 (Miss. 1988); Franklin v. Lovitt Equipment Co., Inc., 420 So.2d 1370, 1373 (Miss. 1982). Fraud is essentially a question of fact which must be proven by clear and convincing evidence. Whittington, 535 So.2d at 585; Parker v. Howarth, 340 So.2d 434, 437 (Miss. 1976).
Mississippi has no law on the question of whether fraud constitutes a tenant's legitimate defense to a landlord's action for rent. Corpus Juris Secundum states:
Fraud or mutual mistake ordinarily may be set up as a defense to an action for rent... . However, in the absence of an enabling statute, it has been held that a fraudulent misrepresentation as to a collateral matter may not be set up in defense to an action for rent on a lease under seal. A representation which is merely false and not fraudulent is not generally regarded as a defense to an action for rent... .
52 C.J.S. Landlord & Tenant § 556(b) (1968).
In this case, the trial court erred in not granting the mall's motion for a directed verdict on the issue of fraud. The defendant-store counterclaimed that the mall had fraudulently overcharged the store for electricity. Despite the attention given to the "overcharging" counterclaim at trial, however, the sole, forthright assertion of fraudulent overcharging raised in the appellee's brief is: "None of the refunds included any interest for MALL's use of FIELDS' funds." That fact is indeed brought out and uncontradicted on the record. But the store made no attempt in its brief to demonstrate how an allegation of lost interest warranted an actual damage award of $25,000. The store cited no authority to support its defense and counterclaim that the mall's behavior met the elements of fraud.
Fields could only succeed on its fraud defense and counterclaim if it could prove the nine elements of fraud. Of those, most importantly, the store would have to have proved that the mall knowingly overcharged and thus harmed the store. The record does not make at all clear that the mall did overcharge, other than those overcharges resulting from master metering projections, for which the mall later issued credits.
Fields also asserted in its brief that the mall's alleged failure to live up to the terms of its March 19, 1986, letter "was sufficient to raise fraud." It is not. Again, the appellee asserted its argument without citing any authority. To support a claim that the mall committed fraud in its March 1986 agreement, the store would have to have proved that, at that meeting, the mall knowingly made false representations on which the store relied, resulting in injury. No evidence supports a conclusion that, in March 1986, the mall lied when it stated it would abide by an expert's decision regarding outstanding electricity bill receivables. No evidence shows that the store was induced to agree because of falsehoods. No evidence shows that the store was harmed as a result of any purported March agreement. To say that the mall breached its agreement to abide by *946 the expert's decision bears no legal relationship to a claim of fraud.
Taken in a light most favorable to the verdict, this Court cannot, with certainty, conclude that the mall did not overcharge. The testimony does not, however, support a conclusion of intentional overcharging and fraud. Even if the jury gave full credit to the store's experts, those experts failed to provide evidence of intentional misrepresentation amounting to fraud. The court should have granted the plaintiff's motion for directed verdict on the issue of the store's fraud counterclaim and should not have submitted the issue to the jury. Thus, on this issue, this Court reverses and renders the decision of the lower court.

C. Did a March 1986 agreement bind the mall?
The mall contends that the trial court should have granted its motion for a directed verdict on the issue of actual damages for breach of contract. Examining the facts, Fields' lease with the mall included an article which stated
It is understood and agreed by Tenant that Landlord and Landlord's agents have made no representations or promises with respect to the leased premises or the making or entry into this lease, except as in this lease expressly set forth, and that no claim or liability, or cause for termination, shall be asserted by Tenant against Landlord for, and Landlord shall not be liable by reason of, the breach of any representations or promises not expressly stated in this lease.
It also included a provision authorizing the mall to charge ten per cent per year on a tenant's unpaid balance.
As discussed earlier, on March 17, 1986, Gary Ogzewalla, who was the mall's general manager, and Jay Keef, Ogzewalla's supervisor, met with Klasky to discuss Klasky's outstanding balance and electricity bill complaints. Ogzewalla wrote Klasky on March 19, 1986, to confirm the agreement regarding receivables.
At trial, the court instructed the jury that if the mall and the store amended or modified their lease, the jury was to enforce the amendment or modification. In addressing the store's claim that its lease was modified in March, 1986, the court instructed:
For [Fields] to modify that written lease agreement, [Fields] must prove by clear and convincing evidence that it was the intent of all parties to the agreement to modify the original lease agreement, and further that there was no mistake between the parties regarding the express terms of the lease agreement and that a valuable consideration was received in exchange for that modification. Unless [Fields] proves that there was a modified lease agreement as required by law, then it is your sworn duty to find that there was no modification of the original lease agreement and that said original lease agreement was in full force and effect.
The court also instructed the jury to return a damage award if the jury found actual damages resulting from breach of contract, including a breach of an implied covenant of good faith and fair dealing.
In a contract which purports to be complete, prior or contemporaneous negotiations are merged into the completed contract. Continental Gin Co. v. Freeman, 237 F. Supp. 240, 244-45 (N.D.Miss. 1964), aff'd, Freeman v. Continental Gin Co., 381 F.2d 459 (5th Cir.1967). A written contract, however, even one that explicitly requires written modification, may subsequently be orally modified. Eastline Corp. v. Marion Apartments, Ltd., 524 So.2d 582, 584 (Miss. 1988); St. Louis Fire & Marine Ins. Co. v. Lewis, 230 So.2d 580 (Miss. 1970). To determine whether or not a written contract anticipates oral modification, one must look to the "four corners" of the contract. See McKee v. McKee, 568 So.2d 262, 262 (Miss. 1990); Pursue Energy Corp. v. Perkins, 558 So.2d 349, 351-53 (Miss. 1990). The question of whether or not the parties waived the requirement of a writing is a jury question. Eastline Corp., 524 So.2d at 584, Green v. Pendergraft, 253 Miss. 891, 901, 179 So.2d 831, 836 (Miss. 1965).
*947 For a subsequent agreement to modify an existing contract, the later agreement must, itself, meet the requirements for a valid contract. Petition of M/V Elaine Jones, 480 F.2d 11, 24-25 (citing 3 Corbin, Contracts § 574 at 371 n. 12 (1960)), amended on other grounds, Canal Barge Co., Inc. v. Griffith, 513 F.2d 911 (5th Cir.1975), cert. denied, Griffith v. Canal Barge Co., Inc., 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 and Canal Barge Co., Inc. v. Griffith, 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975); McGee v. Clark, 343 So.2d 486, 489, supplemented by 346 So.2d 914 (1977). Since a contract modification must have the same essentials as a contract, a binding post-contract agreement must fulfill the requirements of a contract regardless of whether a party characterizes it as a modification or a stand-alone contract.
Applying the law to the facts on this issue, this Court holds that the trial court properly denied the mall's request for a directed verdict. The evidence was sufficient to raise a jury question as to whether or not a contract existed and whether or not it had been breached. This Court notes, however, that the trial court's instructions unduly restricted the jury to considering only a lease modification or amendment. True, the mall's lease with the store purported to fully integrate and extinguish any other claims and liabilities; under the law of contracts, however, that disclaimer functioned only to extinguish prior or contemporaneous modifications to the formation of the lease contract. This lease did not contain a clause barring future oral modifications or other contracts that might dispose of matters arising out of the lease relationship. Thus, the jury should have been able to consider the validity of a contract between the mall and Fields.
The store's contention that the March 19 letter constituted a written contract lacks merit. On its face, the letter plainly purports to be nothing more than the confirmation of an agreement. The question for the trier-of-fact becomes, then, whether the March 17 oral agreement, of which the March 19 letter is evidence, constituted a binding contract, either as a lease modification or as an independent contract. If a contract did exist, the trier-of-fact must determine which of West's conclusions should have been honored and whether one of the parties failed in that duty. On this issue, the Court remands.[3]

D. Did the mall's acceptance of reduced rent payments constitute 
accord and satisfaction?
The mall contends that the trial court erred in submitting the issue of accord and satisfaction to the jury. The facts show that, after unilaterally reducing rent payments to compensate for the alleged electricity refund due him, Klasky resumed paying regular rent in November of 1986 and paid electricity at the West-calculated rate of $1,985 per month. Klasky did not submit his checks with any condition that the mall's acceptance of them constituted an acknowledgement of the propriety of his having taken a deduction. The store asserts that the mall's acceptance of payment from Fields, because Fields intended it as payment in full, constituted accord and satisfaction.
The rule of law governing accord and satisfaction requires that:
(1) something of value [is] offered in full satisfaction of demand; (2) accompanied by acts and declaration [that] amount to a condition that if the thing offered is accepted, it is accepted in satisfaction; (3) the party offered the thing of value is bound to understand that if he takes it, he takes subject to such conditions; and (4) the party actually does accept the item.
Cook v. Bowie, 448 So.2d 286, 287 (Miss. 1984), (citing Lovorn v. Iron Wood Products Corp., 362 So.2d 196, 197 (1978)); Sherwin-Williams Co. v. Sarrett, 419 So.2d 1332, 1334-35 (Miss. 1982). An agreement of accord and satisfaction "must have all the essentials of a contract and may be express, or implied from the circumstances." *948 Cook, 448 So.2d at 287 (citing Roberts v. Finger, 227 Miss. 671, 677-78, 86 So.2d 463, 465 (1956)).
The store's argument on this issue has no merit. No evidence of record demonstrated that Klasky placed a condition on his rent payments that acceptance would constitute satisfaction of his debts, nor could he have legally done so. Since Klasky was legally obligated to pay rent, he could not unilaterally fashion an accord and satisfaction by saying, essentially, "If you cash this check, it means you accept my new terms." According to the evidence in this record, his action merely constituted delinquency, not accord and satisfaction. No evidence demonstrated that the mall understood anything more than that the store was not paying its full rent. The facts do not reveal the contract essentials required to formalize an accord and satisfaction.
The court committed reversible error in submitting this instruction to the jury. The minimal evidence sufficient to support a jury instruction in accord and satisfaction fails to appear on the record. The allegation that the mall may have breached an agreement to refund money to the store did not imply the mall's corresponding agreement to accept reduced rent payments from the store. No evidence indicates that the mall did anything other than accept what rent it could get while demanding the remaining shortfall from the store. Therefore, on this issue this Court reverses and renders.

IV.

CONCLUSION
For the foregoing reasons, this Court reverses and remands for a new trial on the issue of breach of contract and reverses and renders on all remaining issues.
REVERSED AND REMANDED FOR NEW TRIAL ON ISSUE OF BREACH OF CONTRACT; REVERSED AND RENDERED ON ALL OTHER ISSUES.
ROY NOBLE LEE, C.J., HAWKINS P.J., and ROBERTSON, SULLIVAN, PITTMAN and BANKS, JJ., concur.
DAN M. LEE, P.J., dissents without written opinion.
McRAE, J., not participating.
NOTES
[1] Mississippi law defines a public utility as a person or corporation

operating ... equipment or facilities for ... [t]he generation, manufacture, transmission or distribution of electricity to or for the public for compensation... . The term "public utility" shall not include any person not otherwise a public utility, who furnishes the services ... only to . .. tenants as an incident of ... tenancy, provided that such services are not sold or resold to such tenants ... on a metered or consumption basis.
Miss. Code Ann. § 77-3-3 (Supp. 1988). The statute prohibits any person from distributing electricity without having obtained a certificate of public convenience or necessity. Id. § 77-3-11(1) (Supp. 1988).
[2] Regarding penalties which the commission might impose, the public utilities statute states:

Any person or corporation which wilfully and knowingly violates any provision of this article, or which fails, omits or neglects to obey, observe or comply with any lawful order, or any part of provision thereof, of the commission shall be guilty of a misdemeanor and, upon conviction thereof, shall be subject to a fine of not more than two hundred dollars... .
Miss. Code Ann. § 77-3-81 (1972).
[3] Miss.R.Civ.P. 49(b), on special verdicts, may be of assistance.