# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CA-01282-SCT

*CONTINENTAL INSURANCE COMPANY AND FIREMEN'S INSURANCE COMPANY OF NEWARK, NEW JERSEY*

*v.*

*TRANSAMERICA RENTAL FINANCE CORPORATION d/b/a MAGIC RENTAL*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/29/97 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JAMES D. HOLLAND |
| | RANDOLPH C. WOOD |
| ATTORNEYS FOR APPELLEE: | JAMES K. DUKES |
| | R. CHRISTOPHER WOOD |
| | JOHN W. HITE, III |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND REMANDED - 10/07/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/28/99 |

### EN BANC.

### SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:

¶1. In this insurance coverage dispute, we consider an insurer's appeal from a circuit court's grant of summary judgment to a secured creditor in possession of the assets of a named insured. The circuit court found the business insurance policy at issue covered the subject loss and the secured creditor succeeded to any such coverage pursuant to Article 9 of the UCC. On appeal, the insurer contends there was no coverage because (1) the policy was effectively modified so as to delete the named insured prior to the date of loss, and (2) the policy expressly prohibited a transfer of a named insured's rights without the insurer's written consent; and alternatively, assuming *arguendo* there was coverage under the policy, (3) the secured creditor did not succeed to any such coverage by operation of law or otherwise under the applicable provisions of Article 9 of the UCC; and (4) any coverage afforded under the policy should be deemed excess to the primary coverage afforded under the secured creditor's policies. Finding that factual issues exist as to whether there was coverage, we hold the grant of summary judgment in favor of the secured creditor was improper. Accordingly, we reverse the trial court's judgment, and we remand this case for further proceedings consistent with this opinion.

## STATEMENT OF THE CASE AND SURROUNDING FACTS

¶2. This insurance coverage dispute originated as a personal injury action filed by Claude Woodward and Peggy Woodward in Jones County Circuit Court in June 1991, and arising out of the May 31, 1990 motor vehicle accident involving Claude Woodward and Joseph Trotter. The Woodwards alleged that Trotter, while acting within the course and scope of his employment with Transamerica Rental Finance Company d/b/a Magic Rental ("Transamerica"), was both negligent and grossly negligent in the operation of a Transamerica vehicle and that such negligence proximately caused the collision between the 1988 Chevy van driven by Trotter and the vehicle driven by Claude Woodward.

¶3. While the Woodwards' action was pending, Trotter and Transamerica obtained leave to file a third-party complaint against Continental Insurance Company and Firemen's Insurance Company of Newark, New Jersey (collectively "Continental"). Trotter and Transamerica alleged that should the Woodwards obtain recovery against them, then they were entitled to recover from Continental pursuant to a comprehensive business insurance policy insuring Corky's Leasing, Inc. ("Corky's Leasing").

¶4. Corky's Leasing was the predecessor corporation to Transamerica. Previously, on June 26, 1989, Corky's Leasing and Transamerica had entered into a Loan and Security Agreement pursuant to a promissory note Corky's Leasing executed payable to Transamerica in the amount of $4,950,000. Corky's Leasing defaulted on the loan, and pursuant to a written "Understanding and Agreement" dated May 17, 1990, and executed by Transamerica and Corky's Leasing on May 18, 1990, Transamerica took possession of Corky's Leasing's assets, including the 1988 Chevy van.

¶5. The Woodwards' personal injury claims against Trotter and Transamerica were ultimately settled, and dismissed with prejudice by the lower court on May 4 and June 12, 1992. In the structured settlement agreement Transamerica reached with the Woodwards, Transamerica agreed to pay a total sum of approximately $2,700,000. The remainder of the case then consisted of Trotter and Transamerica's third-party indemnity action against Continental which sought recovery of the $1 million liability limits allegedly afforded under that policy.

¶6. On November 1, 1995, Transamerica filed its Motion for Summary Judgment seeking recovery of the $1,000.000.00 in insurance coverage allegedly provided by the Continental policy in favor of Corky's Leasing. Transamerica argued that it qualified as a secured creditor entitled to the insurance proceeds by operation of law pursuant to Article 9 of the Uniform Commercial Code ("UCC"). Transamerica further argued it was entitled to receive all proceeds from Corky's Leasing's insurance policies as a matter of substantive insurance law.

¶7. On November 2, 1995, Continental filed its Motion for Summary Judgment. Continental argued its insurance policy was not applicable to the Woodwards' claims against Trotter and Transamerica because a valid endorsement modifying the policy and deleting both Corky's Leasing as a named insured and Corky's Leasing's scheduled vehicles, including the 1988 Chevy van, became effective May 18, 1990. Continental also alleged that Transamerica had procured replacement insurance coverage effective May 18, 1990, to cover Corky's Leasing's assets, including liability coverage for the 1988 Chevy van. Finally, Continental claimed that no coverage under its policy could apply here because the policy's "no transfer" clause had not been satisfied.

¶8. On January 23, 1997, the court entered its order granting Transamerica's Motion for Summary Judgment and denying Continental's Cross-Motion for Summary Judgment. In its order, the court specifically found: (1) the Continental policy was in effect on the date of the accident and specifically covered the vehicle involved in the accident; and (2) Transamerica succeeded to such coverage as a matter law pursuant to U.C.C. Article 9-207 because "once a secured party has taken possession of the collateral under default it is protected from accidental loss, and any insurance coverage for the repossessed collateral is for the benefit of the secured party." Thereafter, on February 25, 1997, the court entered a judgment on its January 23, 1997 Order.

¶9. On February 23, 1997, Continental filed its Motion for Reconsideration and submitted a variety of new evidence including the affidavit of Ronald Roberts. On May 27, 1997, the trial court denied Continental's Motion for Reconsideration.

¶10. On March 7, 1997, Continental filed a Motion to Alter or Amend Judgment. In this motion, Continental raised for the first time the issue of whether the "other insurance" provision in its policy applied to the instant action. On October 6, 1997, the trial court denied Continental's Motion to Alter or Amend Judgment.

¶11. On October 10, 1997, Continental timely filed its notice of appeal to this Court from the following Orders entered by the lower court:

a. The order filed on January 23, 1997, granting Transamerica's Motion for Summary Judgment and denying Continental's Cross-Motion for Summary Judgment;

b. The order/judgment filed on February 25, 1997, ordering Continental to pay Trotter and Transamerica $1,000,000.00;

c. The order filed on May 27, 1997, denying Continental's Motion for Reconsideration;

d. The order filed on October 6, 1997, denying Continental's Rule 59(e) Motion to Alter or Amend Judgment.

## STATEMENT OF THE LAW

¶12. This Court set forth the standard of review for summary judgment in *Aetna Cas. & Sur. Co. v. Berry*, 669 So.2d 56, 70 (Miss. 1996):

The standard for reviewing the granting or denying of summary judgment is the same standard as is employed by the trial court under rule 56(c). This Court conducts de novo review of an order granting or denying summary judgment and looks at all the evidentiary matters before it- admissions in pleading, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, the moving party is entitled to a judgment as a matter of law, summary judgment should worthwith be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant would be given the benefit of the doubt.

*Id*. (*quoting **Mantachie Natural Gas v. Mississippi Valley Gas Co.***, 594 So. 2d 1170, 1172 (Miss. 1992)); *see also **Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1095 (Miss. 1996)*.

## I.

¶13. Continental argues the lower court erred as a matter of law in granting Transamerica's Motion for Summary Judgment and denying Continental's Cross-Motion for Summary Judgment. Continental contends the lower court erred in the following particulars:

> 1. In finding that the Continental policy of liability insurance was in effect and applicable to Corky's Leasing and the 1988 Chevy van on the date of the accident (ie. May 31, 1990) notwithstanding the pre-accident formation of a valid endorsement deleting the same;

> 2. In finding that the Continental policy of liability insurance was in effect, applicable to the subject loss and available to Transamerica notwithstanding the policy's "no transfer" clause's prohibition against the transfer of a named insured's rights without Continental's written consent;

> 3. Alternatively, assuming *arguendo* coverage under the Continental policy applied to the subject loss, in finding that Transamerica succeeded to any such coverage by operation of law or otherwise under the applicable provisions of Article 9 of the UCC; and

> 4. Alternatively, again assuming *arguendo* coverage under the Continental policy applied to the subject loss, in not finding that the excess clause within the "other insurance" provision of Continental's policy operated to render such coverage excess to the primary coverage afforded under the Transamerica policies due to the application of "exclusion g" under Section IV4b(3) of the Continental policy.

## II.

¶14. Continental claims that Corky's Leasing and Continental reached a "meeting of the minds" in early May 1990 with regard to modification of the Continental policy so as to delete Corky's Leasing as a named insured, together with all of its scheduled vehicles (including the 1988 Chevy van) effective May 18, 1990. Continental contends no coverage existed under the Continental policy with respect to either Corky's Leasing or the 1988 Chevy van on the date of the accident, May 31, 1990. Accordingly, Continental complains the lower court committed reversible error in its January 23, 1997, order in finding that the Continental policy was "in effect on the date of the accident and specifically covered the vehicle involved in the accident."

¶15. Transamerica alleges Continental's argument that its policy had been canceled prior to the date of the accident is without merit for both procedural and substantive reasons. First, Transamerica claims Continental failed to file the affidavit of Ronald Roberts into the record prior to the date the summary judgment was granted, and that, under Mississippi law, no new evidence may be submitted after the entry of summary judgment unless there are extraordinary circumstances and the evidence is "newly discovered." Transamerica claims Continental failed to demonstrate that it had met either of these requirements.

¶16. Additionally, as a matter of substantive law, Transamerica argues the policy at issue was not canceled prior to the date of the accident. Transamerica claims Ronald Roberts lacked the authority to cancel the

policy because he was no longer President of Corky's Leasing. Transamerica further contends that even if Roberts had the authority to cancel the policy, he did not do so until after the accident. Transamerica also claims that any oral contract or oral modification of the insurance contract between Roberts and Continental specifically required a writing and there was no writing until after the accident.

¶17. Prior to the May 31, 1990, accident, Corky's Leasing, which operated a rental business in Laurel, Mississippi, had been listed as one of four named insureds on a comprehensive business liability policy, No. 11 CBP 6055148-91, issued by Continental. Continental maintains this insurance policy was modified effective May 18, 1990, so as to delete Corky's Leasing as a named insured, together with all of its scheduled vehicles including the 1988 Chevy van involved in the May 31, 1990, accident.

¶18. Specifically, Continental claims the President of Corky's Leasing, Ronald Roberts, orally instructed his insurance agent, Paul McPhillips, in a telephone conversation they had in early May 1990 to remove Corky's Leasing as a named insured under the Continental policy, together with all of its scheduled vehicles, since Transamerica was foreclosing upon Corky's Leasing's assets and had arranged to provide its own liability insurance coverage contemporaneous with its foreclosure. Continental further claims that a valid, binding endorsement was immediately created to that effect. Continental also claims the portion of the premium Corky's Leasing had previously paid for coverage under the Continental policy beyond the May 18, 1990, foreclosure date was refunded to Corky's Leasing (i.e., $28, 503.00).

¶19. In his deposition testimony, McPhillips testified that Roberts orally instructed him in early May 1990 (either May 1 or May 15) to delete Corky's Leasing and all of its scheduled vehicles from the Continental policy effective May 26, 1990.[1] According to McPhillips, Roberts sought to remove Corky's Leasing from the Continental policy because Corky's Leasing was being "bought out" by Transamerica. McPhillips testified that he explained to Roberts "all you have to do is sign a release, a loss policy release-or, excuse me, a release for Corky [sic] to cancel them off the policy." McPhillips further testified that he mailed Roberts a policy release form "about May 18 or 19" and that Roberts signed and returned the form. In his affidavit, Roberts attests he signed the form on May 26, 1990. The record is silent as to when McPhillips received the signed document. McPhillips also testified the written endorsement itself was not mailed until June 19, 1990. McPhillips claimed it is customary in the insurance industry for it to take up to three months to complete the paperwork on endorsements.

¶20. In addition to McPhillips' deposition testimony and Roberts' affidavit testimony, Continental directs this Court's attention to the cancellation request/policy release form signed by Roberts (stating the effective date of cancellation was May 18, 1990) and the subsequent written endorsement issued by Continental (also stating the effective date of the endorsement was May 18, 1990).

¶21. Continental argues that under Mississippi law the oral modification to the policy deleting Corky's Leasing and the 1988 Chevy van was immediately binding and effective upon the conclusion of the telephone conversation which occurred in early May 1990, some weeks prior to the May 31, 1990 accident. Continental relies on *Singing River Mall v. Mark Field's, Inc.*, 599 So. 2d 938, 946-47 (Miss. 1992), for the proposition that a written contract, even one that explicitly requires written modification, may be modified by subsequent oral agreement if the oral modification itself meets the requirements for a contract. Continental also relies on *St. Louis Fire & Marine Ins. Co. v. Lewis*, 230 So. 2d 580, 582 (Miss. 1970); and *Southern Ins. Co. v. Ryder Truck Rental, Inc.*, 240 So. 2d 283, 287 (Miss. 1970), for the proposition that written contracts of insurance may be modified by subsequent

oral agreement provided the oral modification can be established by satisfactory evidence, and this is true even if the written contract is not thereafter reformed. Continental also claims that any mention by either McPhillips or the Continental policy as to the eventual inclusion of a written endorsement to the policy did not create a condition subsequent so as to preclude the immediate effectiveness and validity of the modification agreed upon.

¶22. Continental also claims the fact that the formal written endorsement memorializing the oral modification (i.e., deleting Corky's Leasing and the 1988 Chevy van from the Continental policy effective May 18, 1990) was not officially incorporated into the policy until after the occurrence of the accident does not alter its previously agreed upon, pre-accident effective date. Accordingly, Continental asserts that neither the date Roberts actually signed the cancellation request nor the date the formal written endorsement became part of the policy are determinative of the actual effective date of the modification. In support of this argument, Continental cites *Turbo Trucking Co., Inc. v. Those Underwriters at Lloyd's of London*, 776 F.2d 527, 529 (5th Cir. 1985) for the proposition that an oral modification to an insurance contract can be effected (and is valid and binding) as of the date of the oral modification even though the actual document memorializing the agreed upon modification is not finalized until a subsequent date.

¶23. In addition, Continental claims evidence that the modification was supported by sufficient consideration may be found in the fact that Continental refunded Corky's Leasing's unearned premium in the amount of $28,503.00.[2] Continental cites *Krebs v. Strange*, 419 So. 2d 178, 181-82 (Miss. 1982), for the proposition that an oral modification to an insurance policy is deemed to be effective without a formal writing if supported by consideration.

¶24. Transamerica claims Continental's first argument, that the Continental policy had been modified prior to the date of the accident, is both procedurally and substantively defective. First, Transamerica complains that Continental failed to submit the affidavit of Ronald Roberts and other documents into the record until after the trial court had rendered its judgment on both Transamerica and Continental's summary judgment motions, and therefore, submission of this evidence was untimely. Transamerica claims that under Mississippi law, no new evidence may be submitted after the entry of summary judgment unless there are extraordinary circumstances and the evidence is "newly discovered." Transamerica claims Continental failed to demonstrate that it had met either of these requirements, and therefore, Continental should not be allowed to introduce new evidence with its Motion for Reconsideration. In support of this argument, Transamerica cites *NLRB v. Jacob Edecker*, 569 F.2d 357, 363 (5th Cir. 1978) (stating "newly discovered evidence must be evidence in existence to which a party was excusable ignorant, discovered after trial") and several cases from other jurisdictions. *See Morgan v. Harris Trust & Savings Bank of Chicago*, 867 F.2d 1023 (7th Cir. 1988); *Preato v. Storer Communications, Inc.*, 152 F.R.D. 654 (N.D. Fla. 1994); *Greaves v. Greaves*, 121 B.R. 234 (N.D. Ill. 1990).

¶25. In reply, Continental maintains the proof it filed with the trial court in support of its Motion for Reconsideration does not constitute "new evidence," but rather, "additional evidence" on legal theories already advanced in its Cross Motion for Summary Judgment. Continental also argues the authorities relied on by Transamerica do not represent controlling Mississippi legal authority, and the facts and circumstance of the instant case make those rulings inapplicable. With respect to Roberts' affidavit, Continental acknowledges that the affidavit represented the first testimonial evidence in the case from Roberts but claims the matters stated in Roberts' affidavit did not present any novel factual positions and should not be characterized as "new evidence." Counsel for Continental further represents to this Court that diligent

investigative efforts were made to locate Roberts before the trial court rendered its judgment but such efforts proved unsuccessful.

¶26. At the hearing on Continental's Motion to Reconsider, Transamerica argued that Roberts's affidavit and other documents submitted by Continental should not be considered because they were not timely filed. However, Transamerica did not file a motion to strike those documents. This Court has held that "[w]here the party against whom a motion for summary judgment is made wishes to attack one or more of the affidavits upon which the motion is based, he must file in the trial court a motion to strike the affidavit." *Hare v. State*, 733 So. 2d 277, 285 (Miss. 1999) ; *Travis v. Stewart*, 680 So. 2d at 217 (Miss. 1996) (*quoting* **Brown v. Credit Ctr., Inc.** 444 So. 2d 358, 365 (Miss. 1984)). "Failure to file the motion to strike constitutes waiver of any objection to the affidavit." **Travis**, 680 So. 2d at 217-18. A party opposing summary judgment must be diligent. **Hare**, 733 So. 2d at 285 (*citing* **Grisham v. John Q. Long V.F.W. Post**, 519 So. 2d 413, 415 (Miss. 1998)). Transmamerica made no other objection than the one at the hearing until its argument in its brief before this Court. Therefore, we hold that since Transamerica failed to file a motion to strike these documents, it has waived any objection to them now.

¶27. Our holding is further supported by the lower court's failure to indicate on the record whether it considered the new material, including Roberts's affidavit. The record reveals that at the conclusion of the hearing, the court denied Continental's Motion to Reconsider, but there is no mention as to whether the court had considered the new material or rejected it as untimely. The court's written order denying the motion is also silent in this respect. In the absence of an expression by the court, we will assume the court considered the new materials, and we will consider them as well.

¶28. With this procedural issue resolved, we now examine the merits of Continental's claim that the policy at issue was no longer in effect and applicable to Corky's Leasing as of the date of the accident (i.e., May 31, 1990). According to Continental, Roberts and McPhillips reached a binding oral agreement to modify the policy so as to delete Corky's Leasing as named insured, together with all its scheduled vehicles, and their agreement contemplated the effective date of the modification was to be the date on which Transamerica repossessed Corky's Leasing's assets and took over operation of Corky's Leasing's rental business (i.e., May 18, 1990).

¶29. In response, Transamerica asserts Roberts lacked authority to "cancel" the policy because he was no longer the President of Corky's Leasing. Transamerica further contends that even if Roberts had the authority to cancel the policy, he did not do so until after the accident. Transamerica also claims that any oral contract or oral modification of the insurance contract between Roberts and Continental specifically required a writing and there was no such writing until after the accident.

¶30. First, Transamerica asserts Roberts had no authority to cancel the policy after May 17, 1990, because he was no longer the President of Corky's Leasing. In support of this argument, Transamerica quotes portions of the affidavit testimony in which Roberts attests that he was President of Corky's Leasing "from July, 1989 until May 17, 1990," and that "on May 18, 1990" Transamerica "took possession of Corky's collateral and assets." Accordingly, Transamerica submits that as of May 18, 1990, Roberts was no longer President of Corky's Leasing, and therefore, he lacked authority to cancel the policy. As to Roberts' testimony that on May 26, 1990, he signed the release form, Transamerica argues this was eight days after Transamerica took possession of Corky's Leasing's assets, and therefore, Roberts had no authority to cancel the policy.

¶31. We disagree. Corky's Leasing did not cease to exist when its assets were acquired by Transamerica (i.e., May 18, 1990). Rather, Corky's Leasing continued to exist until the date its corporate authority was administratively revoked (i.e., March 5, 1991), and Roberts continued as its President until that time. Therefore, we hold that Roberts retained authority to remove Corky's Leasing as a named insured under the Continental policy during the time period in question (i.e., May 1990). The issue then becomes whether Roberts did, in fact, effectively modify the policy prior to the May 31, 1990 accident.

¶32. Transamerica's position is that if Roberts effectively canceled the policy, he did not do so until after the accident occurred. Transamerica argues McPhillips advised Roberts that any request for cancellation had to be in writing, and thus, Roberts' pre-accident telephone conversation with McPhillips cannot be construed as an oral modification of the insurance policy. In support of this argument, Transamerica relies on the deposition testimony of McPhillips, in which Continental's agent stated he did not fax a cancellation or release form to Roberts until either June 13 or June 18, 1990, and before faxing the form, he had not received any written request for cancellation from Roberts. Transamerica argues this portion of McPhillips's testimony reveals Continental could not possibly have received any written request to cancel the insurance policy until at least two weeks after the accident.

¶33. In reply, Continental asks this Court to consider what the controlling policy conditions provided in order for a named insured to effect a change in the terms of the policy (i.e., deletion of Corky's Leasing and the 1988 Chevy van). Under the section of the Continental policy entitled "Common Policy Conditions," the following provisions appear:

A. Cancellation

1. <u>The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.</u>

*******************

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered the refund.

*******************

B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. <u>The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy</u>.

(emphasis added). According to Continental, Roberts did not request that the entire policy be canceled, only that a "change" in its terms be made (i.e., deletion of Corky's Leasing and its scheduled vehicles from the policy). Continental notes the policy remained in effect with respect to the three named insureds not

affected by Transamerica's foreclosure action. Continental further asserts that all the requirements set forth within the policy conditions to effect a "change" in the policy (as opposed to "cancellation") were satisfied by the pre-accident phone conversation between Roberts and McPhillips in early May 1990 and the required endorsement was subsequently issued by Continental and made part of the policy.

¶34. The written endorsement states May 18, 1990, as its effective date. Continental also argues that the endorsement's post-accident issuance date does not alter its pre-accident effective date (i.e., May 18, 1990). In support of this argument, Continental notes that in addition to the subject endorsement, the Continental policy has some thirteen other policy endorsements which concern changes in the policy requested by the named insured, and all of them reflect an effective date prior to the date each of the endorsements formally became part of the policy. According to Continental, McPhillips touched upon this in his testimony when he explained that a three-month delay in having the endorsement issued and it formally becoming part of the policy is customary in the insurance industry. Therefore, Continental concludes the effective date of the change (i.e., May 18, 1990) which appears in both the policy release form and the written endorsement controls, meaning there was no coverage afforded under the policy applicable to the May 31, 1990, loss.

¶35. According to Transamerica, Continental's own actions indicate that it did not intend to orally modify the policy prior to the date of the accident (i.e. May 31, 1990). First, Transamerica argues the fact that the policy release form Continental attached to its Motion for Reconsideration (allegedly prepared by Continental after the accident) contained a signature line for "Transamerica" evinces that Continental believed the policy was still in effect and Continental believed Transamerica was entitled to the proceeds of the policy.

¶36. In reply, Continental argues the policy release form does not contain a signature line for Transamerica. Continental claims Transamerica's name was only included at the bottom of the form to show the reason for Corky's Leasing's "cancellation request," and that was because Transamerica was the source from which replacement insurance for Corky's Leasing's former assets had been written.

¶37. Second, Transamerica asserts that Continental was still seeking premium payments for the Corky's Leasing's policy some four days after the accident, and this, too, is evidence that the policy had not been canceled at the time of the accident. Specifically, Transamerica cites to the deposition testimony of O. L. Fitzpatrick, an agent of Transamerica, in which he testifies that McPhillips, called him on behalf of Continental to inquire whether Transamerica would be paying the eleven thousand dollar premium that was due at that time.

¶38. In reply, Continental claims it did not seek premium payments from Transamerica in June 1990. Continental explains that McPhillips telephoned a Transamerica official in early June 1990, to inquire whether Transamerica would assume responsibility for any earned premiums which might be due on the policy. Continental claims that at that time, McPhillips knew that Transamerica had assumed control of Corky's Leasing's assets, and although he understood that Corky's Leasing and its scheduled vehicles had been deleted from the policy, McPhillips did not understand then that Transamerica had procured from other sources its own replacement liability coverage for the assets it had foreclosed upon.

¶39. The summary judgment motion is the only pretrial motion which allows the Court to "go behind the pleadings" and consider evidence such as admissions, answers to interrogatories, depositions, and affidavits. *Lattimore v. City of Laurel*, NO. 98-CA-00331-SCT, 1999 WL 233867, at \*1 (Miss. Apr. 22, 1999).

If this examination indicates there is no genuine issue of material fact, the moving party is entitled to a judgment as a matter of law. *Id. (citing **Newell v. Hinton***, 556 So. 2d 1037, 1041-42 (Miss. 1990)). In reaching this determination, the Court examines affidavits and other evidence to determine whether a triable issue of material fact exists. *Id.* Our purpose is not to resolve such an issue. *Id.* For, we cannot try issues of fact on a [Rule 56](#) motion; we may only determine whether such issues exist. ***Yowell v. James Harkins Builder, Inc.*** 645 So. 2d 1340, 1343-44 (Miss. 1994) (*quoting **Brown v. Credit Ctr., Inc.*** 444 So. 2d 358, 362 (Miss. 1983)). The motion for summary judgment, while designed to expose "sham" claims and defenses, should not be used to circumvent a trial on the merits where there are genuine issues of material fact. [M.R.C.P. 56 cmt](#).

¶40. In ***Singing River Mall***, 599 So. 2d at 946-47, this Court stated as follows:

> In a contract which purports to be complete, prior or contemporaneous negotiations are merged into the completed contract. A written contract, however, even one that explicitly requires written modification may subsequently be orally modified. To determine whether or not a written contract anticipates oral modification, one must look to the "four corners" of the contract. The question of whether or not the parties waived the requirement of a writing is a jury question.

> For a subsequent agreement to modify an existing contract, the later agreement must, itself, meet the requirements for a valid contract. Since a contract modification must have the same essentials as a contract, a binding post-contract agreement must fulfill the requirements of a contract regardless of whether a party characterizes it as a modification or a stand-alone contract.

(citations omitted).

¶41. Examining the contract at issue here, we find different requirements to effect a "change" in the terms of the policy as opposed to a "cancellation" of the policy. All that is required to effect a "change" in the terms of the policy is the named insured's expression of intent to make a change, the insurer's consent thereto, and an endorsement issued by Continental. However, to effect a "cancellation" of the policy, advance <u>written</u> notice of the insured's intent to cancel the policy is required.

¶42. McPhillips testified that he explained to Roberts "all you have to do is <u>sign</u> a release, a loss policy release-or, excuse me, a release for Corky [sic] to cancel them off the policy" (emphasis added). Roberts testified that he signed a policy release form on May 26, 1990. Based on the testimony of Continental's own agent and Corky's Leasing's President, we find it was the understanding of both parties that the Continental policy required a signed written request in order for Roberts to effectively remove Corky's Leasing as a named insured together with its scheduled vehicles.

¶43. The question then becomes whether the policy release form signed by Roberts satisfied the requirement for a writing or whether the parties agreed to waive the writing requirement. In his affidavit, Roberts testified he signed a policy release form on May 26, 1990, several days prior to the accident. Consistent with this testimony, McPhillips testified on direct examination that he mailed Roberts a policy release form "about May 18 or 19." However, on cross examination, McPhillips testified he did not fax a policy release form to Roberts "until either June 13 or June 18." We find this conflicting testimony to be problematic. Also problematic is the fact that the document relied on by Transamerica to suggest the policy release form bore an illegible fax date of either June 13 or June 18 was not made part of the record.

¶44. Also of concern are the conflicting accounts as to what transpired during the course of the telephone conversation between Roberts and McPhillips in early May 1990. According to Transamerica, McPhillips orally advised Roberts there would be no valid modification of the policy until Continental <u>received</u> a written request for cancellation. There is no evidence in the record as to when Continental received the signed request. We know only that Roberts claims he signed the request on May 26, 1990. Continental, on the other hand, claims Roberts and McPhillips reached an oral agreement to modify the existing written contract (i.e., the parties waived the requirement of a writing). The question of whether the parties waived the requirement of a writing is a jury question. *Singing River Mall Co.*, 599 So. 2d at 946.

## CONCLUSION

¶45. Numerous factual issues exist which prevent a determination as to whether the Continental policy was effectively modified so as to remove Corky's Leasing and its scheduled vehicles prior to the May 31, 1990 accident. Accordingly, the Circuit Court's judgment is reversed, and this case is remanded for further proceedings consistent with this opinion.

¶46. **REVERSED AND REMANDED.**

**PRATHER, C.J., PITTMAN, P.J., BANKS, SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**McRAE, JUSTICE, DISSENTING:**

¶47. In reversing and remanding this case, the majority cites the conflicting testimony surrounding the insurance release form as "problematic" and one for the jury. What may prove to be more problematic is the majority's decision which in essence allows an insurance company the opportunity to deny or cancel coverage **after** an accident. Accordingly, I dissent.

¶48. This case appears to be one of law, with little or no conflicts of fact for a jury to decide. At best, the facts in this case show that Roberts requested an endorsement prior to the accident. However, no cancellation of the policy occurred until Continental's agent faxed Roberts a copy sometime between June 13-18, approximately two weeks after the accident. The plain language of the policy provides that it cannot be canceled unless in writing. Therefore, Corky's Leasing and its scheduled vehicles were under coverage at the time of the accident on May 31, 1990.

¶49. Pursuant to Miss. Code Ann. § 63-15-43(6)(a) (1996), the liability of an insurance company "shall become absolute whenever injury or damage covered by said motor vehicle liability policy occurs; **said policy may not be canceled or annulled as to liability by any agreement between the insurance company and the insured after the occurrence of the injury or damage . . . .**" (emphasis added). To allow an insurance company to deny coverage when it has accepted the premium on a policy and the insured has relied on its protection is unjust and clearly against public policy. *Bland v. Bland*, 629 So.2d 582, 589 (Miss. 1993)(*citing Gulf Guar. Life Ins. Co. v. Kelley*, 389 So.2d 920 (Miss.1980)(court held insurer was estopped from canceling insurance policy when decedent died only days after obtaining insurance, in spite of contract that clearly provided for such cancellation within 90 days of agreement).

¶50. The trial judge was correct in granting summary judgment. The circuit court correctly found the

business insurance policy at issue covered the subject loss and the secured creditor succeeded to any such coverage pursuant to Article 9 of the UCC. Accordingly, I dissent.

1. According to Continental, while Roberts specified to McPhillips the date of May 26, 1990, as the effective date for the endorsement, McPhillips later learned from Transamerica officials that the actual foreclosure date was to be May 18, 1990, and the endorsement was changed to reflect this earlier date.

2. However, there is no evidence in the record that Continental refunded Corky's Leasing's unearned premium.